**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>        Debtors. | 10 Civ. _____<br><br>Bankr. Case No. 08-13555 (JMP)<br>(Jointly Administered) |
| LEHMAN BROTHERS HOLDINGS INC.,<br><br>        Plaintiff,<br><br>    - against -<br><br>UNITED STATES OF AMERICA,<br><br>        Defendant. | Adversary Proceeding<br>No. 10-03211 |

**MEMORANDUM OF LAW IN SUPPORT OF THE GOVERNMENT'S**
**MOTION FOR AN ORDER WITHDRAWING THE REFERENCE**

PREET BHARARA
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone:  (212) 637-2722, 2745, 2679
Facsimile:  (212) 637-2686
E-mail: robert.yalen@usdoj.gov
      joseph.cordaro@usdoj.gov
      jean-david.barnea@usdoj.gov

ROBERT WILLIAM YALEN
JOSEPH N. CORDARO
JEAN-DAVID BARNEA
Assistant United States Attorneys
    &mdash; Of Counsel

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................... 1

BACKGROUND ............................................................................................. 3

    A.    Lehman's Bankruptcy ........................................................... 3

    B.    This Adversary Proceeding ................................................... 4

ARGUMENT ................................................................................................. 6

THIS ADVERSARY PROCEEDING SHOULD BE LITIGATED IN
DISTRICT COURT .......................................................................................... 6

    A.    Legal Standards .................................................................. 6

        1.    Tax Refund Actions .................................................... 6

        2.    Withdrawal of the Reference ........................................ 7

    B.    Withdrawal of the Reference is Mandatory in This Action ................... 8

        1.    This Proceeding Involves Significant Interpretation of
Non-Bankruptcy Federal Law ...................................... 9

        2.    Resolution of this Case Will Require the Court to
Determine Whether the Substitute Payments Paid
by LBIE to LBI Should be Treated as Dividends for
U.S. and U.K. Tax Purposes ....................................... 11

            a.    Issues Arising Under the 1975 U.S.-U.K.
Tax Treaty ................................................... 12

                i.    The Treatment of the LBIE-LBI Substitute
Payments Under the Treaty .................... 12

                ii.    The Treatment of the LBIE-LBI Substitute
Payments for U.S. Tax Purposes ............ 13

            b.    This Case May Require the Court to Apply
Unsettled Judicial Tax Doctrines ..................... 16

C.      This Court Should Withdraw the Reference as a Matter
        of Discretion........................................................................ 19

        1.      This Adversary Proceeding Is a Non-Core Proceeding ............. 20

        2.      Withdrawal of the Reference Serves Judicial Economy............ 21

        3.      Withdrawal of the Reference Will Save the Parties from
                Cost and Delay............................................................ 22

        4.      Withdrawal Will Not Affect Administration of
                the Bankruptcy ........................................................... 23

        5.      Forum Shopping Is Not an Issue Here ..................................... 23

CONCLUSION......................................................................................... 24

## TABLE OF AUTHORITIES

**FEDERAL CASES**

*Altria Group, Inc. v. United States,*
    694 F. Supp. 2d 259 (S.D.N.Y. 2010) ........................................................... 17, 18

*Black & Decker Corp. v. United States,*
    436 F.3d 431 (4th Cir. 2006) ............................................................................. 18

*Cent. Vt. Pub. Serv. Corp. v. Herbert,*
    341 F.3d 186 (2d Cir. 2003) ................................................................................ 7

*City of New York v. Exxon Corp.,*
    932 F.2d 1020 (2d Cir. 1991) ......................................................................... 9, 10

*Dunmore v. United States,*
    358 F.3d 1107 (9th Cir. 2004) ........................................................................... 21

*EAL (Del.) Corp. v. European Organisation for the Safety of Air Navigation
    (In EAL (Del.) Corp.),* No. 93-578-SLR,
    1994 WL 828320 (D. Del. Aug. 3, 1994) .......................................................... 11

*Eastern Airlines, Inc. v. Air Line Pilots Assoc. (In re Ionosphere Clubs, Inc.),*
    No. 89 Civ. 8250 (MBM), 1990 WL 5203 (S.D.N.Y. Jan. 24, 1990) .................. 9

*Ferguson v. Comm'r,*
    29 F.3d 98 (2d Cir. 1994) .................................................................................. 17

*Gregory v. Helvering,*
    293 U.S. 465 (1935) .......................................................................................... 17

*Halper v. Halper,*
    164 F.3d 830 (3d Cir. 1999) .............................................................................. 21

*In re Horizon Air,*
    156 B.R. 369 (N.D.N.Y. 1993) ............................................................................ 9

*In re Lehman Bros. Inc.,*
    Case No. 08-1420 (JMP) (Bankr. S.D.N.Y.) ....................................................... 4

*In re Oil Co.,*
    140 B.R. 30 (E.D.N.Y. 1992) ............................................................................. 10

*In re Pan Am Corp.,*
    133 B.R. 700 (S.D.N.Y. 1991) .......................................................................... 10

*In re Parmalat Finanziaria S.p.A.,*
    320 B.R. 46 (S.D.N.Y.  2005)............................................................................. 21

*In re S.G. Phillips Constructors, Inc.,*
    45 F.3d 702 (2d Cir. 1995) .............................................................................. 21

*In re Vicars Ins. Agency, Inc.,*
    96 F.3d 949 (7th Cir. 1996) ............................................................................. 19

*IRS v. CM Holdings, Inc. (In re CM Holdings, Inc.),*
    221 B.R. 715 (D. Del. 1998)............................................................................. 10

*James v. Comm'r,*
    899 F.2d 905 (10th Cir. 1990) ......................................................................... 16

*Keene Corp. v. Williams Bailey & Wesner, L.L.P. (In re Keene Corp.),*
    182 B.R. 379 (S.D.N.Y. 1995)........................................................................... 10

*Klamath Strategic Inv. Fund v. United States,*
    568 F.3d 537 (5th Cir. 2009) ........................................................................... 18

*Kohn v. Haymount Ltd. P'ship (In re Int'l Benefits Group, Inc.),*
    No. 06-2363 (KSH), 2006 WL 2417297 (D.N.J. Aug. 21, 2006) ...................... 23

*Lee v. Comm'r,*
    155 F.3d 584 (2d Cir. 1998) ............................................................................ 19

*Long Term Capital Holdings v. United States,*
    330 F Supp. 2d 122 (D. Conn. 2004)................................................................ 18

*Magnone v. United States,*
    902 F.2d 192 (2d Cir. 1990) .............................................................................. 7

*McCrory Corp. v. 99¢ Only Stores (In re McCrory Corp.),*
    160 B.R. 502 (S.D.N.Y. 1993)........................................................................... 10

*Mishkin v. Ageloff,*
    220 B.R. 784 (S.D.N.Y. 1998)..................................................................... 21, 22

*Moses v. Allard (In re Moses),*
    779 F. Supp. 857 (E.D. Mich. 1991)................................................................. 11

iv

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.,*
    458 U.S. 50 (1982) ........................................................................................ 7

*Orion Pictures Corp. v. Showtime Networks Inc. (In re Orion Pictures Corp.),*
    4 F.3d 1095 (2d Cir. 1993) ....................................................... 21, 22

*Rice's Toyota World, Inc. v. Comm'r,*
    752 F.2d 89 (4th Cir. 1985) ............................................................... 17

*S. St. Seaport Ltd. P'ship v. Burger Boys, Inc. (In re Burger Boys, Inc.),*
    94 F.3d 755 (2d Cir. 1996) ............................................... 20, 21, 23

*Sec. Farms v. Int'l B'hood of Teamsters,*
    124 F.3d 999 (9th Cir. 1997) ............................................................ 21

*Shugrue v. Air Line Pilots Ass'n (In re Ionosphere Clubs, Inc.),*
    922 F.2d 984 (2d Cir. 1990) ............................................................... 9

*Shugrue v. Pension Benefit Guar. Corp. (In re Ionosphere Clubs, Inc.),*
    142 B.R. 645 (S.D.N.Y. 1982) ........................................................ 10

*Snap-On Tools, Inc. v. United States,*
    26 Cl. Ct. 1045 (1992) ...................................................................... 12

*Stobie Creek Invs. LLC v. United States,*
    608 F.3d 1366 (Fed. Cir. 2010) ................................................ 17, 18

*U.S. Gypsum Co. v. Nat'l Gypsum Co. (In re Nat'l Gypsum Co.),*
    145 B.R. 539 (N.D. Tex. 1992) .......................................................... 9

*United States v. Clintwood Elkhorn Mining Co.,*
    553 U.S. 1 (2008) ................................................................................ 6

*United States v. Forma,*
    42 F.3d 759 (2d Cir. 1994) ................................................................. 7

**STATUTES**

Bankruptcy Amendments and Federal Judgeship Act of 1984,
    Pub. L. No. 98-353, 98 Stat. 333 (1984) ........................................ 7

Bankruptcy Code, 11 U.S.C. §§ 101-1330,

    11 U.S.C. § 505(a)(1) ........................................................................ 7, 22

    11 U.S.C. § 505(a)(2)(B) ................................................................. 21, 22

    11 U.S.C. § 1106 .................................................................................. 4

Health Care and Education Affordability Reconciliation Act of 2010,
    Pub. L. No. 111-152, 124 Stat. 1029 (2010) .................................... 19

Internal Revenue Code, 26 U.S.C. §§ 1-9834,

    I.R.C. § 316(a) ................................................................................... 16

    I.R.C. § 901(k)(1)(A) ................................................................... 15, 16

    I.R.C. § 6532(a)(1) .............................................................................. 6

    I.R.C. § 6662 ........................................................................................ 5

Securities Investor Protection Act of 1970,
    15 U.S.C. § 78aaa ............................................................................... 4

28 U.S.C. § 157 ............................................................................................ 7

28 U.S.C. § 157(b) ..................................................................................... 22

28 U.S.C. § 157(b)(2) ................................................................................ 21

28 U.S.C. § 157(c) ..................................................................................... 22

28 U.S.C. § 157(d) ............................................................................. *passim*

28 U.S.C. § 1334(a) ..................................................................................... 8

28 U.S.C. § 1346(a)(1) .......................................................................... 6, 21

**REGULATION**

IRS Treas. Reg. § 1.1502-77 ...................................................................... 6

**OTHER AUTHORITIES**

Convention for the Avoidance of Double Taxation and the Prevention of
      Fiscal Evasion with Respect to Taxes on Income and Capital Gains,
      U.S.-U.K., Dec. 31, 1975, 31 U.S.T. 5668 ................................................ *passim*

Convention Regarding Double Taxation and Preventing of Fiscal Invasion,
      U.S.-U.K., July 24, 2001, S. Treaty Doc. No. 107-19 (2003), ........................... 2

Fed. R. Bankr. P. 5011(a) ........................................................................... 8

Fed. R. Bankr. P. 7001 ............................................................................... 7

Jeffrey C. Glickman & Clark R. Calhoun,
      *The "States" of the Federal Common Law Tax Doctrines,*
      61 Tax Law 1181 (2008) ....................................................................... 19

I.R.S. Ch. Couns. Adv. 200612013 (Mar. 24, 2006) ..................................... 12

I.R.S. Rev. Proc 80-18, 1980-1 C.B. 623 ................................................... 12

I.R.S. Rev. Proc 2000-13, 2000-1 C.B. 515 ............................................... 14

Defendant the United States of America (the "United States" or the "Government"), by its attorney Preet Bharara, United States Attorney for the Southern District of New York, respectfully submits this memorandum of law in support of its motion for withdrawal of the reference of this adversary proceeding to the United States Bankruptcy Court for the Southern District of New York, pursuant to 28 U.S.C. § 157(d).

## PRELIMINARY STATEMENT

In this adversary proceeding, Lehman Brothers Holdings Inc. ("Lehman") seeks a refund of over $110 million in federal taxes and penalties, plus interest, in connection with the 1999 and 2000 tax years. The dispute involves hundreds of stock-lending transactions whereby Lehman's United Kingdom ("U.K.") subsidiary, Lehman Brothers International (Europe) ("LBIE") borrowed publicly traded U.K. equities from Lehman Brothers Inc. ("LBI"), one of Lehman's U.S. subsidiaries, which itself had borrowed the equities from unrelated U.S. lenders. Whenever dividends on the U.K. equities were paid, LBIE remitted to LBI equivalent amounts, known as "substitute payments," which LBI then remitted to the unrelated lenders.

The resolution of this adversary proceeding turns, not on any interpretation of the Bankruptcy Code, but rather on the interpretation of certain provisions of a 1975 U.S.-U.K. tax treaty—the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital Gains, U.S.-U.K., Dec. 31, 1975, 31 U.S.T. 5668, *available at* 1980 WL 309113 (the

"Treaty")[1]—and the Internal Revenue Code.  Specifically, the court must determine whether LBI properly claimed over $141 million of foreign tax credits on its United States tax returns with respect to substitute payments remitted from LBIE to LBI. In order for Lehman to prevail, it will have to demonstrate that the substitute payments should be treated as dividends for purposes of certain provisions of the Treaty, but should not be treated as dividends for U.S. tax purposes.  The Government will contend that such inconsistent treatment is contrary to the plain language of the Treaty and runs afoul of the Internal Revenue Code.  In addition, the court also may have to analyze the LBIE-LBI stock-lending transactions against the backdrop of several judicial tax doctrines, including principally the "economic substance" doctrine.

Withdrawal of the reference is mandatory under 28 U.S.C. § 157(d) when resolution of a proceeding requires the court to decide substantial questions of non-bankruptcy law.  Here, the resolution of this case requires substantial interpretation of U.S. tax laws and a treaty, not the Bankruptcy Code.  Moreover, this case presents an issue of first impression with respect to the definition of the word "dividend" in the Treaty.  Nothing more is required for mandatory withdrawal of the reference.

But even if withdrawal were not mandatory, the district court has discretion under section 157(d) to withdraw the reference upon a showing of cause that turns

---

[1]     This Treaty was superseded by the Convention Regarding Double Taxation and Preventing of Fiscal Invasion, U.S.-U.K., July 24, 2001, S. Treaty Doc. No. 107-19 (2003), *available at* 2001 WL 34315021, which entered into force on March 31, 2003.  Only the 1975 Treaty is at issue in this litigation.

2

mostly on considerations of judicial economy.  This tax-refund litigation will inevitably end up in district court either on appeal or upon the bankruptcy court's proposed findings of fact and conclusions of law, which this Court will review *de novo*.  Withdrawal of the reference thus will conserve the resources of both the parties and the courts, and it poses no threat to the administration of Lehman's bankruptcy estate.

## BACKGROUND

A.   **Lehman's Bankruptcy**

Prior to the events leading up to its bankruptcy, Lehman was the fourth-largest investment bank in the United States and employed 25,000 individuals.[2] Lehman operated worldwide, and had memberships or associate memberships on several foreign stock exchanges, including those in London, Tokyo, Hong Kong, Frankfurt, Paris, Milan, and Australia.

On September 15, 2008, Lehman filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code.  At the time of its filing, the Lehman bankruptcy was the largest in history in terms of the debtor's assets, which exceeded $600 billion.  Since September 2008, twenty-two additional Lehman affiliates (collectively, with Lehman, "Debtors") have filed Chapter 11 petitions. LBI, the U.S. subsidiary involved in the stock-lending transactions at issue, is not a

---

[2]      The description of Lehman is taken from its bankruptcy court filings. *See, e.g.*, LBHI's Motion, Pursuant to Sections 105(a), 363(b)(1), and 363(f) of the Bankruptcy Code and Rule 6004(h) of the Bankruptcy Rules, for Authorization to Transfer Certain Mortgage Servicing Rights to Aurora Bank FSB, filed June 23, 2010 (Bankr. Ct. Dkt. # 9809); Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed Sept. 15, 2008 (Bankr. Ct. Dkt. # 2).

debtor in the Lehman bankruptcy, but is the debtor in a proceeding in the bankruptcy court commenced under the Securities Investor Protection Act of 1970, 15 U.S.C. § 78aaa *et seq.  See In re Lehman Bros. Inc.,* Case No. 08-1420 (JMP) (Bankr. S.D.N.Y.).

On January 20, 2009, the bankruptcy court (Hon. James M. Peck, *B.J.*) approved the appointment of an examiner in Debtors' Chapter 11 cases.  On March 11, 2010, the examiner issued a report of his investigation pursuant to section 1106 of the Bankruptcy Code.  On April 14, 2010, Debtors filed a revised joint Chapter 11 plan and disclosure statement.

## B.    This Adversary Proceeding

According to Lehman's complaint,[3] LBI was a regulated broker-dealer organized under Delaware law with its principal place of business in New York.  *See* Compl. ¶¶ 12-13.  LBIE was a regulated broker-dealer organized under the laws of the United Kingdom with its principal place of business in London.  *See id.* ¶ 15-16. LBI frequently borrowed stock issued by companies resident in the United Kingdom ("U.K. stock"), from unrelated lenders in the United States, pursuant to standard stock-lending agreements.  *See id.* ¶ 14.  LBIE, in turn, borrowed U.K. stock from LBI pursuant to a master overseas stock-lending agreement, which governed stock-lending transactions between the two entities.  *See id.* ¶ 18.

---

[3]      The complaint in this adversary proceeding (cited herein as "Compl.") is annexed as Exhibit A to the Declaration of Joseph N. Cordaro, dated August 17, 2010 (cited as "Cordaro Decl.").  For the purposes of this motion, the Government recites Lehman's factual allegations as if they were true, but such recitation is not an admission by the Government of any allegation in the complaint.

Whenever a U.K. issuer paid a dividend on stock that LBIE had borrowed from LBI, the master lending agreement required LBIE to make a "substitute payment" to LBI that was "representative of" the actual dividend paid. *See id.* ¶ 18. LBI would then make a further substitute payment to the unrelated U.S. lenders that had loaned it the U.K. stock in the first place. *See id.* ¶ 14.

LBI allegedly incurred U.K. withholding taxes with respect the substitute payments made by LBIE. *See id.* ¶ 19. On its 1999 U.S. tax return, Lehman claimed $45,859,270 of foreign tax credits for U.K. withholding taxes allegedly incurred with respect to the substitute payments. *See id.* ¶ 31. On its 2000 U.S. tax return, Lehman claimed $95,553,341 of foreign tax credits for the same reason. *See id.* ¶ 36. The aggregate amount of tax credits at issue for the two tax years was $141,412,611. *See id.* ¶ 20.

The IRS disallowed the claimed foreign tax credits, resulting in a net increase in Lehman's tax liability in 1999 and 2000 of $91,918,198. *See id.* ¶ 21(a). The IRS also imposed an accuracy-related penalty under section 6662 of the Internal Revenue Code in the amount of $18,383,639. *See id.* ¶ 21(b). The sum of these two figures, $110,301,837, constitutes Lehman's monetary demand in this action, along with interest assessed on this amount and overpayment interest on the amount to be refunded. *See id.* ¶ 1.

On June 10, 2008, for the purposes of compliance with the procedures for filing an administrative claim and tax refund action in district court, Lehman paid the taxes, penalties, and deficiency interest that resulted from the IRS's disallowance of the claimed foreign tax credits and imposition of the penalty. *See*

5

*id.* ¶¶ 22, 24.  On December 10, 2008, Lehman filed a tax refund claim with the IRS and demanded the taxes, penalties, and deficiency interest assessed and collected in connection with the stock-lending transactions at issue.  *See id.* ¶ 25.

On April 13, 2010, Lehman[4] commenced the instant adversary proceeding in the bankruptcy court.  On June 21, 2010, the Government filed its answer.  *See* Cordaro Decl., Ex. B.  On July 1, 2010, the bankruptcy court issued an order authorizing Lehman's Official Committee of Unsecured Creditors to intervene in the adversary proceeding.  *See id.* Ex. C.  The bankruptcy court has scheduled an initial conference for August 18, 2010.

## ARGUMENT

## THIS ADVERSARY PROCEEDING SHOULD BE LITIGATED IN DISTRICT COURT

### A.    Legal Standards

### 1.    Tax Refund Actions

The IRS's final decision disallowing a taxpayer's refund claim is reviewable in either federal district court or the Court of Federal Claims.  *See United States v. Clintwood Elkhorn Mining Co.*, 553 U.S. 1, 4 (2008); *see also* 28 U.S.C. § 1346(a)(1) (giving district courts and Court of Federal Claims jurisdiction over "[a]ny civil action . . . for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected"); I.R.C. § 6532(a)(1).  A taxpayer

---

[4]      Lehman alleges that as the common parent of an affiliated group of corporations that filed 1999 and 2000 tax returns, it is the sole agent authorized to act on its own behalf, and on behalf of all members of that group.  *See* Compl. ¶¶ 7-8 (citing Treas. Reg. § 1.1502-77(a)(1), (2)(v)).

seeking to challenge the IRS's determination in district court must pay the taxes before commencing suit. *See Magnone v. United States*, 902 F.2d 192, 193 (2d Cir. 1990); *see also United States v. Forma*, 42 F.3d 759, 766 (2d Cir. 1994) ("[T]he Government gets to collect first and taxpayers can ask questions in the district courts only later."). Here, Lehman satisfied the assessed liabilities for 1999 and 2000 prior to filing the instant action. *See* Compl. ¶ 24.

Where, as here, the tax refund claim belongs to a bankrupt debtor's estate, the action also may be commenced as an adversary proceeding in bankruptcy court. *See* 11 U.S.C. § 505(a)(1) (providing that the bankruptcy court "may determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid . . . ."); *id.* § 505(a)(2)(B) (discussing when the bankruptcy court may determine "any right of the estate to a tax refund"); Fed. R. Bankr. P. 7001 (indicating that "a proceeding to recover money or property," *inter alia*, is an "adversary proceeding").

### 2.    Withdrawal of the Reference

In 1982, the Supreme Court declared unconstitutional the broad grant of jurisdiction to bankruptcy judges contained in the Bankruptcy Act of 1978, which had included the authority to finally determine all bankruptcy-related matters. *See N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982). Congress reacted by enacting the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, 98 Stat. 333 (1984). *See Cent. Vt. Pub. Serv. Corp. v. Herbert,* 341 F.3d 186, 190 (2d Cir. 2003). Section 104 of that statute, codified at 28

U.S.C. § 157, defines the current relationship between bankruptcy courts and district courts.

Even though district courts have "original and exclusive jurisdiction of all cases under title 11," 28 U.S.C. § 1334(a), a district court may "refer[ ] to the bankruptcy judges for the district" any or all bankruptcy cases, *id.* § 157(a).  Since 1984, all bankruptcy cases in this District have been referred to the bankruptcy court.  *See* Standing Order of Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern District of New York (July 10, 1984) (Hon. Robert J. Ward, Acting *C.J.*).

Section 157(d) of Title 28 governs the district court's withdrawal of the reference of a case (or part of a case) to the bankruptcy court and re-assertion of the district court's exclusive jurisdiction:

> The district court *may* withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown.  The district court *shall*, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

28 U.S.C. § 157(d) (emphases added).  The two sentences of section 157(d), respectively, are referred to as the "discretionary" and "mandatory" withdrawal provisions.  "A motion for withdrawal of a case or proceeding shall be heard by a district judge."  Fed. R. Bankr. P. 5011(a).

## B.   Withdrawal of the Reference is Mandatory in This Action

This tax refund action turns on whether LBI was entitled to U.S. foreign tax credits arising out of the LBI-LBIE stock-lending transactions.  *See* Compl.

¶¶ 19-20.  Resolution of the case necessarily will require substantial interpretation of non-bankruptcy laws, making withdrawal of the reference mandatory.

### 1.   This Proceeding Involves Significant Interpretation of Non-Bankruptcy Federal Law

The mandatory withdrawal provision specifies that a "district court *shall* . . . withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce."  28 U.S.C. § 157(d) (emphasis added).  This is undisputedly such a case.

The purpose of the mandatory withdrawal provision is "'to assure that an Article III judge decides issues calling for more than routine application of [federal] statutes outside the Bankruptcy Code.'"  *In re Horizon Air, Inc.*, 156 B.R. 369, 373 (N.D.N.Y. 1993) (quoting *Eastern Airlines, Inc. v. Air Line Pilots Assoc. (In re Ionosphere Clubs, Inc.)*, No. 89 Civ. 8250 (MBM), 1990 WL 5203, at *5 (S.D.N.Y. Jan. 24, 1990)).  Thus, section 157(d) requires withdrawal of the reference for any proceeding "that would otherwise require a bankruptcy court judge to engage in significant interpretation, as opposed to simple application, of federal laws apart from the bankruptcy statutes."  *City of New York v. Exxon Corp.*, 932 F.2d 1020, 1026 (2d Cir. 1991); *see also U.S. Gypsum Co. v. Nat'l Gypsum Co. (In re Nat'l Gypsum Co.)*, 145 B.R. 539, 541 (N.D. Tex. 1992).

Under this standard, a district court must withdraw the reference whenever "substantial and material consideration of non–Bankruptcy Code federal statutes is necessary for the resolution of the proceeding."  *Shugrue v. Air Line Pilots Ass'n (In*

*re Ionosphere Clubs, Inc.)*, 922 F.2d 984, 995 (2d Cir. 1990) (internal quotation marks omitted); *accord McCrory Corp. v. 99¢ Only Stores (In re McCrory Corp.)*, 160 B.R. 502, 505 (S.D.N.Y. 1993). Courts in this circuit have "recognized that the mandatory withdrawal standard is more easily satisfied when complicated issues of first impression are implicated under non-bankruptcy federal laws," *Keene Corp. v. Williams Bailey & Wesner, L.L.P. (In re Keene Corp.)*, 182 B.R. 379, 382 (S.D.N.Y. 1995), but section 157(d) requires withdrawal of the reference whenever a proceeding pending in bankruptcy court involves anything more than the routine application of non-bankruptcy laws, *see id.* (withdrawal of the reference "warranted when resolution of the matter would require the bankruptcy judge to 'engage in significant interpretation, as opposed to simple application,' of federal non-bankruptcy statutes" (quoting *Exxon*, 932 F.2d at 1026)).

Courts applying these standards routinely withdraw the reference in cases—such as this one—that implicate substantial questions of tax law. *See, e.g., Shugrue v. Pension Benefit Guar. Corp. (In re Ionosphere Clubs, Inc.)*, 142 B.R. 645, 649 (S.D.N.Y. 1992) (holding withdrawal was mandatory where resolution of adversary proceeding required significant interpretation of Internal Revenue Code and ERISA); *In re Oil Co.*, 140 B.R. 30, 34-35 (E.D.N.Y. 1992) (holding withdrawal was mandatory where objection to IRS claim presented issues of first impression under Internal Revenue Code). These cases confirm the proposition that the Internal Revenue Code is non-bankruptcy "law[ ] of the United States regulating organizations or activities affecting interstate commerce." *See, e.g., IRS v. CM Holdings, Inc. (In re CM Holdings, Inc.)*, 221 B.R. 715, 721 (D. Del. 1998) ("[F]ederal

10

tax law regulates organizations or activities affecting interstate commerce, as required under 28 U.S.C. § 157(d).").  Cases requiring reference to or interpretations of international treaties are also routinely heard in district court.  *See, e.g.*, *EAL (Del.) Corp. v. European Organisation for the Safety of Air Navigation (In re EAL (Del.) Corp.)*, No. 93-578-SLR, 1994 WL 828320, at *2-12 (D. Del. Aug. 3, 1994) (reference was withdrawn to decide sovereign immunity of entity created by international treaty); *Moses v. Allard (In re Moses)*, 779 F. Supp. 857 (E.D. Mich. 1991) (reference was withdrawn to decide whether requiring debtor's testimony at creditors' meeting might improperly subject debtor to foreign prosecution and potential extradition under extradition treaty).

      2.      **Resolution of this Case Will Require the Court to Determine Whether the Substitute Payments Paid by LBIE to LBI Should be Treated as Dividends for U.S. and U.K. Tax Purposes**

This case presents several novel issues of tax law, both domestic and international.  As explained below, the court that decides this case will have to first determine whether the 1975 Treaty applied to the stock-lending transactions at issue.  Assuming that the Treaty applied at all, the court will then have to resolve an issue of first impression concerning the definition of "dividend" in the Treaty. The court then will have to analyze the interplay between the Treaty, as interpreted, and the Internal Revenue Code.  Finally, the court may have to apply one or more judicial tax doctrines to the transactions at issue.  Any one of these reasons provides a satisfactory basis for mandatory withdrawal of the reference.

### a.      Issues Arising Under the 1975 U.S.-U.K. Tax Treaty

On December 31, 1975, the United States and United Kingdom signed the Treaty, which entered into force on April 25, 1980.  The Treaty, *inter alia,* addressed tax credits granted under U.S. and U.K. law to shareholders receiving dividends from U.K. issuers.  *See* I.R.S. Ch. Couns. Adv. ("I.R.S. C.C.A.") 200612013 (Mar. 24, 2006), *available at* 2006 WL 752330.

Prior to 1999, the United Kingdom had in place a regime that allowed U.K.-based shareholders receiving dividends from U.K. companies to receive a tax credit for the dividend tax paid by the companies.  *See Snap-On Tools, Inc. v. United States,* 26 Cl. Ct. 1045, 1050 (1992); I.R.S. Rev. Proc. 80-18, § 2, 1980-1 C.B. 623.  Nonresident shareholders were entitled to no such credit, however.  *See* I.R.S. Rev. Proc. 80-18, § 2.  For distributions occurring after April 5, 1999, the tax credit available to U.K. resident shareholders was limited to one-ninth of the dividend; non-resident shareholders remained ineligible for the credit.  *See* I.R.S. C.C.A. 200612013.  The one-ninth system was the U.K tax system applicable to the LBIE-LBI transactions, as these took place in 1999 and thereafter.

### i.      The Treatment of the LBIE-LBI Substitute Payments Under the Treaty

The first issue for the court will be whether LBI was entitled to any tax benefits under the Treaty.  Article 10(2) of the Treaty allowed U.S. residents to claim certain tax benefits with respect to *"dividends"* paid by U.K. corporations, "[a]s long as [a] United Kingdom [resident would be] entitled under United Kingdom law to a tax credit in respect to dividends paid by a corporation which is

resident in the United Kingdom." Treaty, art. 10(2). Accordingly, in order to determine whether the Treaty was applicable to the stock-lending transactions at issue, the court will have to determine whether the substitute payments from LBIE to LBI should be treated as "dividends paid by a corporation which is resident in the United Kingdom." This is a pure question of treaty interpretation (and, by incorporation, U.K. tax law) that has yet to be addressed by any U.S. court. *See id.* art. 10(3) (defining "dividends" for U.K. purposes to include "any item which under the law of the United Kingdom is treated as a distribution").

### ii.   The Treatment of the LBIE-LBI Substitute Payments for U.S. Tax Purposes

Assuming *arguendo* that the LBIE-LBI substitute payments are properly treated as "dividends" for U.K. tax purposes, the court next will have to decide whether LBI was entitled to claim foreign tax credits in the United States for U.K. withholding taxes arising out of the stock-lending transactions. Resolution of this question requires interpretation of several provisions of the Treaty, and is an issue of first impression.

First, under Article 10(2)(a)(ii) of the Treaty, certain U.S. resident shareholders who obtained a dividend from a U.K. corporation were entitled to a payment from U.K. Inland Revenue (the "U.K. Cash Payment") in an amount equal to the tax credit that a U.K. resident would have been entitled had she received the dividend. The Treaty then subjected the U.K. Cash Payment to a withholding tax "not exceeding 15 per cent of the aggregate of the amount or value of the dividend and the amount of the tax credit paid to such resident." *Id.* art. 10(2)(a)(ii). After 1999, when the tax credit to U.K. resident shareholders was limited to one-ninth

13

(*i.e.*, approximately 11%) of the dividend, the tax credit for U.S. shareholders granted in Article 10(2)(a)(ii) and this withholding tax (of up to 15%) effectively canceled each other out. *See generally* I.R.S. Rev. Proc 2000-13, § 3.02, 2000-1 C.B. 515 (allowing certain U.S. investors to elect to be treated as having received a U.K. Cash Payment under the 1/9 system, without actually making a claim for payment to U.K. Inland Revenue).

LBI claimed foreign tax credits in the United States arising out of the withholding tax associated with the LBIE-LBI stock-lending transactions. The Government takes the position that the Treaty and Internal Revenue Code explicitly forbid these foreign tax credits. Under Article 10(2)(a)(iii) of the Treaty:

> [T]he aggregate of the amount or value of the dividend and the amount of the tax credit referred to in subparagraph[ ] (a) . . . (ii) of this paragraph paid by the United Kingdom to the United States corporation or other resident (without reduction for the . . . 15 percent deduction . . . by the United Kingdom), shall be treated as a dividend for United States tax credit purposes.

Treaty, art. 10(2)(a)(iii). In the Government's view, the Treaty's signatories intended that the same "aggregate of the amount or value of the dividend and the amount of the tax credit" used to calculate the withholding tax in Article 10(2)(a)(ii) would also be the "aggregate of the amount or value of the dividend and the amount of the tax credit" that is "treated as a dividend for United States tax credit purposes" in Article 10(2)(a)(iii).

Since the Treaty specifies that this sum must be treated as a dividend for U.S. tax credit purposes, the Government will argue that the provisions of the Internal Revenue Code regarding tax credits for individuals must then be applied. In particular, under section 901(k) of the Code, credits generally may not be claimed

14

with respect to dividends in situations where a taxpayer would not bear any meaningful risk of loss or possibility of gain in the underlying stock as a result of a short holding period or an obligation to make offsetting payments—such as the substitute payments LBI was obliged to make to the original U.S. stock lender. *See* I.R.C. § 901(k)(1)(A)(i), (ii). Accordingly, LBI would not be entitled to its claimed foreign tax credits because of its obligation to make offsetting payments to its third party stock lenders.

The Government expects Lehman, however, to argue that the LBIE-LBI substitute payments should be treated as dividends under U.K. law, thereby triggering the Treaty, but should *not* be treated as dividends for U.S. tax purposes—thus skirting section 901(k). In order for this argument to succeed, Lehman must convince the court that the "aggregate amount of or value of the dividend and the amount of the tax credit"—treated as a "dividend" for U.S. tax credit purposes under Article 10(2)(a)(iii)—is zero. The only way to accomplish this seemingly mathematical impossibility is for Lehman to invoke Article 10(3) of the Treaty, which indicates that the term "dividends," for U.S. tax purposes "includes any item which under the law of the United States is treated as a distribution out of earnings and profits"—even though this provision does not refer to Article 10(2)(a)(ii) or (iii), and does not purport to supply the exclusive definition of the word "dividend."

While the Government is confident that its interpretation of Article 10(2)(a)(iii) is consistent with the plain language of the Treaty, and that Lehman's argument strains both the Treaty's language and credulity, it is clear that the

15

resolution of the Treaty issue—which is one of first impression—requires substantial interpretation of the Treaty provisions, as well as analysis of U.S. and U.K. tax law.  Nothing more is required for mandatory withdrawal of the reference.[5]

### b.   This Case May Require the Court to Apply Unsettled Judicial Tax Doctrines

Even if Lehman's interpretation of the Treaty were to prevail, it still is not entitled to relief.  The Government will argue in the alternative that LBI's foreign tax credits should be disallowed because the stock-lending transactions "lack[ed] an appreciable effect, other than tax reduction, on a taxpayer's beneficial interest" and thus should not be "recognized for tax purposes."  *James v. Comm'r,* 899 F.2d 905, 908 (10th Cir. 1990).  In order to decide this issue, the court will have to apply a judicial doctrine whose contours are unsettled in this circuit.

As courts have long recognized, "[a]n activity will not provide the basis for deductions if it lacks economic substance."  *Ferguson v. Comm'r,* 29 F.3d 98, 101 (2d Cir. 1994) (citations omitted).  The economic substance doctrine "seeks to distinguish between structuring a real transaction in a particular way to obtain a tax benefit, which is legitimate, and *creating* a transaction to generate a tax benefit, which is illegitimate."  *Stobie Creek Invs. LLC v. United States*, 608 F.3d 1366, 1375

---

[5]   Lehman also may attempt to argue that the substitute payments are not dividends for purposes of the Internal Revenue Code.  This line of argument would require the court to determine whether a substitute payment is a "dividend in respect to stock of a corporation."  I.R.C. § 901(k)(1)(A).  The Government will take the position that it surely is.  *See id.* § 316(a) ("For purposes of this subtitle, the term 'dividend' means any distribution made by a corporation to its shareholders . . . .").  Once again, the resolution of this question also will depend on a substantial interpretation of U.S. tax law.

16

(Fed. Cir. 2010) (collecting authorities); *see also Gregory v. Helvering,* 293 U.S. 465, 469 (1935) ("The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted. . . . [T]he question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." (citations omitted)).

Courts typically utilize a two-pronged test for economic substance that takes into account the subjective business purpose of the transaction and its objective economic effect. *See Altria Group, Inc. v. United States,* 694 F. Supp. 2d 259, 281 (S.D.N.Y. 2010). The subjective "business purpose" prong asks whether "the taxpayer was motivated by no business purposes other than obtaining tax benefits in entering the transaction." *Rice's Toyota World, Inc. v. Comm'r,* 752 F.2d 89, 91 (4th Cir. 1985). The objective "economic effect" prong looks at whether "a transaction lacks economic reality, has no bona fide business purpose or was shaped solely by tax-avoidance features." *Stobie Creek Investments,* 608 F.3d at 1375 (citation and internal quotation marks omitted). There is debate, however, over whether the test is disjunctive (*i.e.,* the transaction has economic substance if it passes either prong) or conjunctive (*i.e.,* the transaction has economic substance only if it passes both prongs). *Compare Black & Decker Corp. v. United States,* 436 F.3d 431, 441 (4th Cir. 2006) ("To treat a transaction as a sham, the court must find [(1)] that the taxpayer was motivated by no business purposes other than obtaining tax benefits in entering the transaction, and [(2)] that the transaction has no economic substance because no reasonable possibility of a profit exists." (citation

17

and internal quotation marks omitted)), *with Klamath Strategic Inv. Fund v. United States,* 568 F.3d 537, 544 (5th Cir. 2009) (adopting the "majority view . . . that a lack of economic substance is sufficient to invalidate the transaction regardless of whether the taxpayer has motives other than tax avoidance").

Although the Second Circuit has not yet addressed this issue, two district courts within this circuit recently have adopted what could be termed an alternative approach.  *See Altria,* 694 F. Supp. 2d at 282 (holding that "the factfinder *must* consider both aspects of the economic substance inquiry, and *may* (but need not) find against the taxpayer if a transaction lacks either a legitimate business purpose or an economic effect"); *Long Term Capital Holdings v. United States,* 330 F. Supp. 2d 122, 171 (D. Conn. 2004) ("[A] finding of either a lack of a business purpose other than tax avoidance or an absence of economic substance beyond the creation of tax benefits can be but is not necessarily sufficient to conclude the transaction is a sham."), *aff'd,* 150 F. App'x 40 (2d Cir. 2005).

While the Government will argue that the proper test is purely conjunctive,[6] *see Lee v. Comm'r,* 155 F.3d 584, 586 (2d Cir. 1998) (transactions must not preclude "any significant profit" for the taxpayer), the law governing this potentially crucial

---

[6]      On March 31, 2010, the President signed the Health Care and Education Affordability Reconciliation Act of 2010, which, *inter alia*, codifies the economic substance doctrine and provides for a *conjunctive* test.  *See* Pub. L. No. 111-152, § 1409, 124 Stat. 1029, 1067-68 (2010) (to be codified at I.R.C. § 7701(o)) (providing that a transaction has economic substance if it "changes in a meaningful way (apart from Federal income tax effects) the taxpayers economic position" *and* "the taxpayer has a substantial purpose (apart from Federal income tax effects) for entering into such transaction.").  While the new statute does not apply directly to the transactions at issue here, the Government's argument is consistent with it.

18

question of tax law is unsettled in the Second Circuit.  Withdrawal of the reference thus is mandatory.  *See In re Vicars Ins. Agency, Inc.,* 96 F.3d 949, 954 (7th Cir. 1996) (finding withdrawal of the reference mandatory when, *inter alia,* "the court must undertake analysis of significant open and unresolved issues regarding . . . non-title 11 law.").[7]

* * *

Ultimately, in order to succeed in this case, Lehman will have to prevail on an issue of first impression concerning a tax treaty, which in turn will involve U.S. and U.K. tax law.  And even if Lehman prevails on that issue, it will have to defeat a challenge based on judicial tax doctrines.  Where, as here, victory for either side turns on the substantial interpretation of non-bankruptcy law, withdrawal of the reference is mandatory under section 157(d).

## C.   This Court Should Withdraw the Reference as a Matter of Discretion

Even if withdrawal of the reference were not mandatory, the reference should nevertheless be withdrawn in the exercise of the Court's discretion.  Section 157(d) provides that a "[d]istrict court *may* withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any

---

[7]   The "substance over form" and "step transaction" doctrines also may become relevant in this case, as the Government may assert them in addition to the economic substance doctrine.  The former doctrine evaluates a transaction based on the "substance" of the outcome of the transaction, rather than the steps that comprise its legal form; the latter permits the court to disregard certain steps in a given transaction if those steps are inserted merely to achieve favorable tax consequences.  *See* Jeffrey C. Glickman & Clark R. Calhoun, *The "States" of the Federal Common Law Tax Doctrines,* 61 Tax Law. 1181, 1185-88 (2008).  Once again, the proper forum for application of these tax doctrines is the district court.

19

party, for cause shown." 28 U.S.C. § 157(d) (emphasis supplied). Although the statute does not define "cause,"

> in deciding whether to withdraw an issue from the bankruptcy court, the district court should weigh several factors, of which the first is the most important: (1) whether the claim is core or non-core, (2) what is the most efficient use of judicial resources, (3) what is the delay and what are the costs to the parties, (4) what will promote uniformity of bankruptcy administration, (5) what will prevent forum shopping, and (6) other related factors.

*S. St. Seaport Ltd. P'ship v. Burger Boys, Inc. (In re Burger Boys, Inc.)*, 94 F.3d 755, 762 (2d Cir. 1996). These factors favor withdrawal of the reference.

## 1.    This Adversary Proceeding Is a Non-Core Proceeding

"A district court considering whether to withdraw the reference should first evaluate whether the claim is core or non-core, since it is upon this issue that questions of efficiency and uniformity will turn." *Orion Pictures Corp. v. Showtime Networks Inc., (In re Orion Pictures Corp.),* 4 F.3d 1095, 1101 (2d Cir. 1993); *see also Burger Boys*, 94 F.3d at 762 (identifying the core/non-core distinction as the "most important" factor).[8] Generally, "a proceeding is core if it invokes a substantive right provided by title 11 or if it is a proceeding, that by its nature, could arise only in the context of a bankruptcy case." *Halper v. Halper*, 164 F.3d 830, 836 (3d Cir. 1999) (internal quotation marks and brackets omitted); *see also In re S.G. Phillips*

---

[8]    While the core/non-core distinction is important, it is not dispositive. "A core proceeding . . . may be withdrawn based on a finding by the Court that the withdrawal of reference is essential to preserve a higher interest." *In re Parmalat Finanziaria S.p.A.*, 320 B.R. 46, 50 (S.D.N.Y. 2005) (citation and internal quotation marks omitted); *see also Mishkin v. Ageloff*, 220 B.R. 784, 800 (S.D.N.Y. 1998) (finding that whether a matter is "core" is not dispositive because "[i]n the final analysis, the critical question is efficiency and uniformity").

*Constructors, Inc.*, 45 F.3d 702, 706 (2d Cir. 1995) ("[A] claim filed against the estate is a core proceeding because it could arise only in the context of bankruptcy." (italics omitted)); *Sec. Farms v. Int'l B'hood of Teamsters*, 124 F.3d 999, 1008 (9th Cir. 1997) ("Actions that do not depend on bankruptcy laws for their existence and that could proceed in another court are considered 'non-core.'"). *See generally* 28 U.S.C. § 157(b)(2) (providing non-exhaustive list of core proceedings).

One court of appeals has addressed this precise issue and squarely held that "tax refund claims do not depend on Title 11 for their existence, but instead depend on 28 U.S.C. § 1346(a)(1), and the [debtor] could have brought them in the district court." *Dunmore v. United States*, 358 F.3d 1107, 1115 (9th Cir. 2004).  In other words, although the Bankruptcy Code provides for tax refund actions, *see* 11 U.S.C. § 505(a)(1), (a)(2)(B), tax refund actions do not rely on the Code for their existence. But for Lehman's bankruptcy, this case already would be in the district court, or in the Court of Federal Claims.  Accordingly, this matter is non-core.

### 2.    Withdrawal of the Reference Serves Judicial Economy

Principles of judicial economy also favor withdrawal of the reference.  First, this non-core proceeding will end up in district court for *de novo* review of the bankruptcy court's proposed findings of fact and conclusions of law.  *See* 28 U.S.C. § 157(c).  Withdrawal of the reference will streamline the litigation by having the district court decide the case in the first instance.  *See Orion Pictures*, 4 F.3d at 1101 ("[T]he fact that a bankruptcy court's determination on non-core matters is subject to *de novo* review by the district court could lead the latter to conclude that

in a given case unnecessary costs could be avoided by a single proceeding in the district court.").[9]

Second, withdrawal of the reference will give the district court time to familiarize itself with the case through the supervision of discovery. *See Mishkin,* 220 B.R. at 801 n.13 ("Although it is difficult at this stage to predict the likelihood that these matters will proceed to trial, . . . I have found that in complicated cases such as this, oversight of the pretrial proceedings provides me with insight into the precise nature of the claims and the theories upon which they are based.").

### 3. Withdrawal of the Reference Will Save the Parties from Cost and Delay

Withdrawal of the reference will also spare the parties unnecessary time and expense. Regardless of whether this proceeding is core or non-core, withdrawal will save the parties from fully litigating this case in the bankruptcy court, only to then bring that court's proposed rulings to this Court, where they may be entirely re-litigated. "[W]ithdrawal of the reference to the bankruptcy court would prevent the inevitable delay and cost to the parties of such a duplication." *Kohn v. Haymount Ltd. P'ship (In re Int'l Benefits Group, Inc.),* No. 06-2363 (KSH), 2006 WL 2417297, at *3 (D.N.J. Aug. 21, 2006).

---

[9]     And even if this proceeding were core, which it is not, withdrawal would nonetheless serve the goal of judicial economy because an appeal to the district court is all but certain in this case. *See* 28 U.S.C. § 157(b).

4.      **Withdrawal Will Not Affect Administration of the Bankruptcy**

Withdrawal of this adversary proceeding will not adversely affect the administration of Lehman's bankruptcy.  This tax refund proceeding has virtually nothing to do with the bankruptcy proceedings generally.  Accordingly, this "limited withdrawal of the reference as to this single issue pose[s] no threat to the uniformity of the administration of this estate." *Burger Boys*, 94 F.3d at 762.

5.      **Forum Shopping Is Not an Issue Here**

Last, forum shopping is not an issue here because this case will ultimately be decided by this Court.  If this Court were to deny the instant motion, it would end up deciding the same issues *de novo* after the bankruptcy court makes its proposed findings, or on appeal from the bankruptcy court.

*      *      *

Thus, every part of the permissive withdrawal inquiry points to granting this motion.  There is no reason to litigate this case in bankruptcy court, only to have it reach the district court months or years from now on appeal, or for review of the bankruptcy court's proposed findings of facts and conclusions of law.

23

**CONCLUSION**

For the foregoing reasons, the Court should grant the Government's motion

to withdraw the reference, and assume jurisdiction over this adversary proceeding.

Dated:        New York, New York
              August 17, 2010

                                 Respectfully submitted,

                                 PREET BHARARA
                                 United States Attorney for the
                                 Southern District of New York
                                 Attorney for the United States of America


                      By:     s/ Joseph N. Cordaro
                              ROBERT WILLIAM YALEN
                              JOSEPH N. CORDARO
                              JEAN-DAVID BARNEA
                              Assistant United States Attorneys
                              86 Chambers Street, 3rd Floor
                              New York, New York 10007
                              Telephone: (212) 637-2722, 2745, 2679
                              Facsimile:  (212) 637-2686
                              E-mail: robert.yalen@usdoj.gov
                                      joseph.cordaro@usdoj.gov
                                      jean-david.barnea@usdoj.gov

24