

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*86 Chambers Street*
*New York, New York 10007*

February 10, 2014

**BY ECF & BY HAND**
The Honorable Richard M. Berman
United States District Judge
United States District Court
500 Pearl Street, Room 1320
New York, NY 10007

     Re: <u>Lehman Brothers Holdings, Inc. v. United States,</u>
       10 Civ. 6200 (RMB)

Dear Judge Berman:

   We write to oppose the request by Lehman Brothers, made on February 7, 2014, for permission to submit a sur-reply in response to the Government's motion *in limine*. Because Lehman's request is little more than a thinly veiled attempt to make arguments now that it did not make in its original opposition brief — and because Lehman's five-page-long application is in essence a sur-reply brief in its own right — the Government believes it necessary to provide a brief substantive response to Lehman's request. For the reasons set forth herein, Lehman's request to submit a sur-reply brief should be denied.

   Lehman tries to make much of the fact that the Government's rebuttal expert, Professor Tricia Brown, paused briefly in responding to Lehman's counsel's questions about Field Service Advice memoranda ("FSAs") written by the IRS Chief Counsel's Office that Lehman claims support its position in this case (though Lehman has never explained how, beyond conclusory assertions). Lehman had Professor Brown's complete deposition transcript well before any briefing on the Government's motion *in limine*, and should not be permitted a supplemental brief to address pauses in response to objectionable deposition questions. Any such arguments could have been but were not raised previously by Lehman. *See, e.g.*, *Nanopierce Techs., Inc. v. Southridge Capital Mgmt.*, No. 02 Civ. 0767 (LBS), 2008 WL 1882702, at *2 (S.D.N.Y. Apr. 21, 2008) ("no injustice was served by denying [plaintiff] leave to file a sur-reply" to address matters that "could have [been] addressed . . . in its opposition papers"). Moreover, Lehman's argument is misguided and disingenuous.

As a threshold matter, Lehman's reliance on FSAs is inappropriate. FSAs specifically state that they are "not binding on [the IRS] and [are] not a final case determination," and that "[s]uch advice is advisory and does not resolve [the IRS's] position on an issue." *See, e.g.*, I.R.S. FSA, 1996 WL 33321253 (May 2, 1996). Indeed, Congress has specifically instructed that FSAs do not set precedent. *See Brunswick Corp. v. United States*, No. 07 C 3792, 2008 WL 5387086, at \*11 (N.D. Ill. Dec. 22, 2008) (citing *Vons Cos. v. United States*, 51 Fed. Cl. 1, 12–13 (2001), and 26 U.S.C. § 6110(k)(3)); *accord ABC Beverage Corp. v. United States*, 577 F. Supp. 2d 935, 951 n.18 (W.D. Mich. 2008) ("[The Government] correctly points out that . . . [FSAs] are considered written determinations under 26 U.S.C. § 6110(b)(1)(a) and have no precedential value under 26 U.S.C. § 6110(k)(3).").

In any event, Lehman's arguments are misplaced. Professor Brown was retained by the Government to serve as a rebuttal expert to address issues raised by Lehman's purported experts, attorneys Steven Hannes and David Foster. *See* Brown Rep. at 1 ("I have been retained by [the Government] to respond to expert reports provided by David Foster and Steven Hannes in connection with the above-referenced matter."). Neither Foster nor Hannes ever mention the FSAs, on which Lehman now so heavily relies, in their reports. Indeed, there is no suggestion that Lehman's supposed experts even read the FSAs in preparing their reports, as they are not included in the lists of materials on which these experts relied that accompanied their reports. *See* Foster Rep. Ex. B; Hannes Rep. Ex. B. As a result, Professor Brown's report also did not discuss the FSAs, since neither Foster nor Hannes referenced or relied upon them. At Professor Brown's deposition, however, Lehman's counsel introduced two of the FSAs as exhibits and asked her questions about them.

The FSAs in question are long, complicated memoranda written by attorneys in the IRS Chief Counsel's office that address several legal questions — having little or nothing to do with the character of payments subject to ACT for U.S. tax credit purposes — in the context of particular taxpayers' disputes with the IRS.[1] The convoluted facts in each are heavily redacted to shield taxpayer information, as required by 26 U.S.C. § 6103. It is thus not surprising that Professor Brown paused to review these documents at her deposition, and that, even after a brief review of less than a minute, she was unwilling to express a definitive view of these documents.

---

[1]     Lehman showed Professor Brown two FSAs: (1) I.R.S. FSA, 1997 WL 33314842 (June 24, 1997), and (2) I.R.S. FSA, 1996 WL 33321253 (May 2, 1996). The first FSA, dated June 24, 1997, is a six-page memorandum in response to a request made three weeks earlier on June 3, 1997. *See* I.R.S. FSA, 1997 WL 33314842 (June 24, 1997). The second FSA, dated May 2, 1996, is a thirteen-page memorandum in response to a request made more than three months earlier, on January 18, 1996. *See* I.R.S. FSA, 1996 WL 33321253 (May 2, 1996). These documents were introduced as Exhibits 10 and 11, respectively, at Professor Brown's deposition.

This is particularly true since neither of the FSAs Lehman showed Professor Brown addressed the precise issues in this case.

Contrary to Lehman's suggestion, Professor Brown repeatedly disagreed with how Lehman's counsel described these documents.  For example, in the long colloquy concerning I.R.S. FSA, 1997 WL 33314842 (June 24, 1997), Professor Brown expressly disagreed with the description of this document by Lehman's counsel, *see* Brown Tr. at 231-32, and later informed Lehman's counsel that she was "confused by [his] characterization of this FSA," *id.* at 237.[2]

Moreover, the testimony Lehman latches onto stems from an objectionable line of inquiry.  For instance, in his objectionable question, Lehman's counsel characterizes the FSAs as embodying "three interpretations, maybe four interpretations" of the Treaty, *see* Brown Tr. at 255-56, and Lehman now claims in its letter that there are six such administrative memoranda.[3] But Lehman showed Professor Brown just two of the supposedly six documents at her deposition.  Lehman cannot now be heard to complain that Professor Brown was unable — on the spot during her deposition — to "reconcile" documents that she was not shown at the deposition and which Lehman's own experts did not rely upon.

More importantly, the entire colloquy cited in Lehman's letter concerned one of the two FSAs, I.R.S. FSA, 1996 WL 33321253 (May 2, 1996), *see* Brown Tr. 247-61, which explicitly labels its analysis as provisional, concluding that "[w]e are currently considering several other cases that present this issue and are continuing to develop our position."  This FSA was indeed later supplemented in 1997 in ways that are relevant to Lehman's line of inquiry, *see* I.R.S. FSA, 1997 WL 33314835 (July 31, 1997),[4] and which renders the language that Lehman relied upon moot, though Lehman omitted these facts from its questioning of Professor Brown or its briefing to this Court.  In this respect, it is telling that the "pauses" which Lehman finds so probative occurred immediately after Lehman's counsel described the language of the initial 1996 FSA while omitting any mention or description of its provisional status or of the subsequent clarifying 1997 FSA.  Moreover, the 1997 FSA embodies the same anti-cherry-picking position that the Government is advancing in this case.[5]  It is disingenuous for Lehman to seize on Professor

---

[2]     The Government has attached the relevant pages from Professor Brown's deposition to this letter.

[3]     Curiously, one of the six documents cited by Lehman, I.R.S. FSA, 1996 WL 33107176 (Sept. 23, 1996), makes absolutely no mention of the Treaty.

[4]     The Government's Reply Memorandum of Law incorrectly cited this document as **1996** WL 33314835, *see* Reply Br. at 2 n.2; the correct citation is provided above.

[5]     Cherry-picking refers to an improper effort by a taxpayer such as Lehman to pick and choose between provisions of the Internal Revenue Code and a treaty in an inconsistent manner,

Hon. Richard M. Berman                                                              page 4
February 10, 2014

Brown's testimony concerning the 1996 FSA, which was not considered by Lehman's own experts, in an effort to manufacture ambiguity in the Treaty.  This is particularly true since Lehman's counsel failed to advise Professor Brown that the provisional 1996 FSA had been supplemented by the IRS a year later in a manner completely consistent with the Government's arguments in this case.

Lehman's effort to point to a pause in response to an objectionable line of questioning about an outdated FSA that was labeled as explicitly provisional and was supplemented one year later does not justify its request for a sur-reply.  Rather, it illustrates the fundamental point that the Government has made throughout this litigation: arguments concerning the interpretation of the Treaty, which is a question of law, can and should be confined to briefs filed by counsel, and should not be based on inadmissible testimony by lawyers masquerading as experts.

Accordingly, the Government respectfully requests that the Court deny Lehman's request to file a sur-reply brief and grant its motion *in limine*.

Respectfully,

PREET BHARARA
United States Attorney
Southern District of New York

By:      *s/ James Nicholas Boeving*

JEAN-DAVID BARNEA
JAMES NICHOLAS BOEVING
AMY A. BARCELO
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.    (212) 637-2679/2748/6559
Fax    (212) 637-2717/2730

Encl.

cc:     Counsel for all parties (by electronic mail)

_____

relying only on those it views as helpful to its position while ignoring those provisions that uncut its claim for tax benefits.

1    treaty -- excuse me, in the context of this FSA?  In

2    fact, it's on page 4?

3         A.   Yes, it's on 4.  "The income on which the

4    tax is imposed is readily traceable" --

5         Q.   Where are you on?

6         A.   Page 4.

7         Q.   What paragraph, so we can follow?

8         A.   First full paragraph.

9         Q.   Go ahead.

10        A.   "The taxes thus should be placed in the

11   same separate category or categories in which the

12   dividends would belong if they were includable in US

13   income."

14        Q.   But they are not; am I right?

15        A.   I think they are putting -- they are

16   treating everything as going into the same basket as

17   they would go into, and they are treating the ACT

18   payment as a dividend.

19        Q.   They are not.  Look at the last two

20   sentences on their conclusions on the ACT refund.

21             After they cite specifically to iii and

22   explain the exact provision that you cite --

23        A.   Oh.

24        Q.   -- they say, "Therefore, we conclude that

25   an ACT refund under Article 10, paragraph 2 of the

Page 232

1  treaty should be treated as a dividend for US tax

2  purposes.  Because these two entities are members of

3  the same consolidated group, the ACT refund that is

4  treated as a dividend should be eliminated on a

5  consolidation."

6      A.   I'm sorry, they are treating it as a

7  dividend, and, therefore, then -- ah, you're saying,

8  and, therefore, they're treating it as a dividend

9  for purposes beyond the foreign tax credit rules.

10     Q.   No.  They are treating it -- they applied

11 US principles in analyzing whether it should be

12 treated as gross income, whether it should be

13 treated as foreign source income for foreign tax

14 credit purposes, and for purposes of basketing, they

15 are using US principles, in all three categories.

16 Whether it's income, whether it's FSI, and what

17 basket it should go in, they don't treat it as a

18 dividend pursuant to iii, even though they cite to

19 iii and quote the very language you rely on.

20          MR. BOEVING:  Is there a question?

21          MR. MADEN:  She asked me a question.  I'm

22     answering her.

23 BY MR. MADEN:

24     Q.   How do you reconcile that with your

25 analysis?

1           MR. BOEVING:  Now I'm going to object.

2           THE WITNESS:  You say they are applying US

3       principles to determine that it is a dividend?

4           I think they are determining the

5       consequences after concluding that it is a

6       dividend under Article 10 of the treaty.

7           They are saying it is a dividend, and then

8       they are determining the US consequences after

9       determining that it is a dividend.

10  BY MR. MADEN:

11      Q.   Okay.  But if -- let's just take it one

12  step at a time.

13           If it were a dividend, then you would have

14  taxable income in the United States.  Instead, it is

15  on consolidation.  Pursuant to the US tax rules, it

16  is treated -- it is excluded from the US taxpayers.

17      A.   Because of the consolidated return regs,

18  not because it's not treated as a dividend.

19      Q.   Okay.  Well, let's not have that debate.

20           Let's take your point much more directly.

21  Let's take your point much more directly.  Look at,

22  on page 3, the paragraph that begins "because -

23  333," where the FSA says "however."

24           "However, the foreign taxes paid with

25  respect to the dividend, both the income tax and the

textPage 234

1    withholding tax, remain creditable taxes and can be

2    used if the group has other foreign source income in

3    the same separate limitation category against which

4    to offset them."

5              If the IRS were interpreting iii in the

6    same way you are, the so-called dividend that is

7    distributed up would create foreign source income.

8    They wouldn't need other foreign source income.

9        A.   It would create foreign source income if

10   it weren't eliminated on consolidation.

11             MR. BOEVING:  Objection.

12   BY MR. MADEN:

13       Q.   We literally just went through this before

14   we got into it, and I asked you, would the -- your

15   interpretation of iii have the effect of giving the

16   US taxpayer foreign source income, even though, in

17   the first example, by virtue of the return of

18   capital rules, there was no gross income; in the

19   second example, the consolidated return regs limited

20   the income.  And to both questions, you said "yes."

21             And so if you want to revise your answer,

22   let's revise it.

23       A.   That there would be --

24             MR. BOEVING:  Object to the question.

25             THE WITNESS:  That there would be no US

1         source income after the consolidation, as a

2         result of the consolidation.

3    BY MR. MADEN:

4         Q.   We're not talking about any US source

5    income.  We're talking about foreign source income.

6         A.   I'm sorry, foreign source income, for US

7    tax purposes.

8         Q.   Okay.  So that is different than what you

9    said earlier, but we'll let the record speak for

10   that.

11              Is your new testimony that -- I don't even

12   know what your new testimony is.  Why don't you

13   explain to me how this works.

14        A.   Can we take a break while I read this?

15              MR. BOEVING:  Let's just do it on the

16        record.

17              MR. MADEN:  No, no.  I can't use my time

18        for that.

19              MR. BOEVING:  It's your document.  And

20        this is what you wanted her to do.

21              MR. MADEN:  But she can answer based upon

22        my representations, if she understood.

23              MR. BOEVING:  She's entitled to review the

24        document that you handed her.  If you don't

25        want her to talk about it, you can pull it

1     away.

2          MR. MADEN:  That's fine.  Go ahead and

3     review it.  But I'm tolling my time during this

4     period.

5          MR. BOEVING:  We're not accepting any

6     tolling of time.  It's an exhibit that you

7     handed her that --

8          MR. MADEN:  She said she did consider

9     summaries of these exact exhibits.

10         MR. BOEVING:  You didn't consider the

11    actual.  You handed her an exhibit that's not

12    listed in her report to date.  Therefore, if

13    she wants to take time to review it, she's

14    entitled to do that.

15         MR. MADEN:  There is a tolling.

16         MR. BOEVING:  It's not tolling.

17         MR. MADEN:  It is a tolling charge.

18         MR. BOEVING:  It's not a freeway.

19         MR. MADEN:  I'm going to go off the

20    record.  I'm going to use the men's room.

21         THE VIDEOGRAPHER:  We're off the record.

22    The time is 5:34 p.m.

23         (Thereupon, a recess was taken, after

24    which the following proceedings were held:)

25         THE VIDEOGRAPHER:  Back on the record.  It

```
                                              Page 237
 1        is 5:38 p.m.
 2   BY MR. MADAN:
 3        Q.   Ms. Brown.
 4        A.   I'm confused by your characterization of
 5   this FSA.
 6        Q.   Okay.
 7        A.   The way I read this, what is the Internal
 8   Revenue Service, what Barbara Felker said, this is
 9   not -- or what Karen Shine, with the approval of
10   Barbara Felker, said, because it's not a general
11   interpretation, but it is their position in this
12   case.
13             What they said is the treaty tells us it's
14   a dividend.
15        Q.   Uh-huh.
16        A.   So we will treat it as a dividend.
17        Q.   Uh-huh.
18        A.   Then we will apply US tax law to it as a
19   dividend and see what happens, which is we eliminate
20   the dividend under consolidation.  We then give a
21   credit for the taxes that are deemed to have been
22   paid to the UK, and we basket it as if it were a
23   dividend.  And we include --
24        Q.   Huh-huh.  I'm sorry, carry on.  Finish
25   your answer.
```

1          A.    I'm sorry.

2                The conclusion says, first, blank --

3          Q.    You've got to tell us where you are so we

4     can follow.

5          A.    I'm in the conclusion.

6          Q.    Okay.  First, okay.

7          A.    "First, the taxpayer should be treated as

8     having received a dividend from the sub."

9          Q.    Yes.

10         A.    "And taxes deemed paid under 902-A should

11    be computed without taking into account the

12    surrendered ACT.

13               "Next, the --

14         Q.    Well, let's just stop right there.

15               The taxes deemed paid under 902 should be

16    computed without taking into account -- okay.  Fine.

17    Carry on.  Sorry.

18         A.    "Next, the taxpayer should be treated as

19    having paid the entire amount of unrefunded ACT, and

20    then claim a credit for that amount under section

21    901-A.

22               "And, finally, although both the actual

23    dividend and the ACT dividend are eliminated from

24    the taxpayer's gross income under the consolidated

25    return regs, they may claim a credit for the

1   withholding tax imposed on the dividend and ACT

2   dividend under section 901-A."

3           So they can take a foreign tax credit,

4   they treat it as a dividend, and they eliminate it

5   on consolidation by applying the US domestic law

6   rules applicable to dividends.

7           So it's exactly what I said.

8       Q.   Okay.  But you were going to reconcile for

9   me the comment on page 3, the "however" sentence.

10  It's in the paragraph that begins "because" in the

11  middle of the page.  Four lines down.

12      A.   Yes.  Because the dividend is eliminated

13  on consolidation, the foreign tax credit is usable

14  only if -- so they did not treat it -- they treated

15  it as gross -- they treated it as dividend income

16  for purposes of the foreign tax credit rules.  As

17  dividend income, it was subject to limitation.

18      Q.   Where do you see that?

19      A.   The rule language that says it's treated

20  as a dividend and eliminated on consolidation.

21  "Therefore, we conclude that an ACT refund under

22  Article 10, paragraph 2 of the treaty should be

23  treated as a dividend for US tax purposes.  Because

24  they are members of the same consolidated group, the

25  ACT refund that is treated as a dividend should be

1   eliminated on consolidation."

2        Q.   But that's like saying we treat it as a

3   dividend -- am I correct, that's like saying we

4   treat it as a dividend, but since the distributing

5   corporation has no US EMP, we eliminate that from

6   income?

7             I mean, that's not saying anything.

8             If it were a dividend, am I correct --

9        A.   No, it's not the same.  I'm sorry.  Go

10  ahead.

11       Q.   So look at -- and then what about in terms

12  of basketing?  You think that the discussion on the

13  bottom of page 3, in terms of basketing, is treating

14  this distribution as a dividend?

15            MR. BOEVING:  Just note my objection.

16            THE WITNESS:  You're confusing

17       characterization and consequences.

18  BY MR. MADAN:

19       Q.   Explain the difference there.

20       A.   It is characterized as a dividend for

21  purposes of the foreign tax credit rules.

22       Q.   Uh-huh.

23       A.   And the consequences of that are that it

24  is eliminated, just like the consequences of being

25  treated as a dividend in this case is that 901-K

                                                    Page 241

 1   applies.

 2        Q.   So going back to my earlier question, you

 3   said, when we were discussing this earlier, that

 4   even if something is eliminated on consolidation, or

 5   for other reasons, for purposes of gross income,

 6   that it, nevertheless, generates foreign source

 7   income.

 8        A.   I misspoke.

 9        Q.   You've changed your answer on that now?

10        A.   Well, no, no, no.

11        Q.   I asked you that three times.

12        A.   I said it produces foreign source income.

13   Dividends are foreign source income.  Does it -- but

14   this is not a rule that relates to the determination

15   of the foreign tax credit limitation.  This is a

16   rule that goes to how it is treated.  What are the

17   consequences more generally.

18             I think I also specifically said I'm not

19   an expert on consolidated foreign tax credit rules,

20   but...

21        Q.   I mean, is it fair --

22        A.   It is a foreign source dividend, and it is

23   subject to the foreign tax credit rules.

24        Q.   Okay.  I mean, is it fair to say that you

25   don't really know how iii applies, what it does?

```
 1       Q.    Okay.   This is the FSA -- another FSA
 2   which has been marked PB 11, which is commonly
 3   referred to in the IRS as a stock dividend example.
 4   It's a joke.
 5            You'll note, Ms. Brown, because I'm a
 6   little bit short on time here, this is another FSA
 7   that is authored by Ms. Felker.  I don't know -- can
 8   you tell who the attorney advisor is?
 9       A.    Grace Fleeman?
10       Q.    Who you said you work with?
11       A.    Yes, I did say that.
12       Q.    So you'll note -- I'm happy to let you
13   look at page 1, which has basically the facts very
14   quickly summarized, if that helps you.  And then I
15   want to get into some of the analysis.
16            MR. BOEVING:  Correction to the record, I
17        don't think Ms. Felker authored this one.  I
18        don't think she did.  It looks like it's Donald
19        Williamson.
20            MR. MADAN:  On the first page, look on the
21        first page.
22            MR. BOEVING:  I was looking for the
23        signature block.
24            THE WITNESS:  Actually, let me --
25            MR. MADAN:  It's from Barbara Felker.
```

1          MR.  BOEVING:  I misspoke.  The first page

2      does say it's from Barbara Felker.

3          (A discussion was held off the record,

4      after which the following proceedings were

5      held:)

6  BY MR. MADAN:

7      Q.   So if we go to the analysis section,

8  you'll notice that the question that's posed is --

9  among the questions, is whether the parent properly

10  excluded these distributions from income and stock

11  dividends.

12          I'm going to direct your attention to page

13  4, where you will see the very common analysis in

14  this FSA, and even your analysis, where they go

15  through the US/UK treaty and conclude:

16  "Notwithstanding the fact that in general there is

17  no income reported, the taxpayer would be entitled

18  to a credit."

19          But before that, they basically lay out

20  the rule of the US/UK treaty and the Rev Proc 8018.

21  You'll see that on page 4, the second-to-last

22  paragraph says, "Second, under Article 10, 2-A, iii,

23  it says the sum" -- it's not the even the word

24  "aggregate."  Ms. Felker and her team have

25  interpreted that as the "sum of this payment from

1  the UK government and the dividend paid by the UK

2  subsidiary is treated as a dividend for US foreign

3  tax credit purposes, and under article 10, 2-A, i,

4  is subject to UK withholding tax of 5 percent.  This

5  5 percent withholding tax is treated as a creditable

6  income tax paid by the US shareholder under Article

7  23, 1-B."

8           So they have, at their disposal, the very

9  provision, iii, and quoting the language --

10  actually, paraphrasing the language of "aggregate"

11  as the "sum" of, in analyzing the various questions

12  that are posed in this FSA.

13           And so -- and you will see that the UK tax

14  treatment of the sub, the credit is imposed on page

15  5, and then the income is excluded.  They analyze

16  305 on page 6.

17           Then as consistent with your point about

18  arbitrage, there is an analysis of sticking the

19  taxpayer to its form under some common law,

20  including this case called Coleman, which I'm sure

21  you're familiar with, Danielson.

22           Then on page 10 is the analysis that I

23  want to discuss with you.  This is the section on

24  foreign tax credits with respect to cash

25  distributions.

1          And in A, it says, "If distributions are
2     taxable dividends in the US," and I will just note
3     that in 2-B, if distributions are non-taxable stock
4     dividends in the US.
5          So the IRS, in this FSA, analyzes it both
6     ways:  Whether it's in income for purposes of the US
7     and out of income for purposes of the US.
8          And you will notice that in 2-A, it says,
9     "If the service succeeds in requiring US parent to
10    include an income the full amount of the cash
11    distributions, the US parent would be entitled,
12    subject to limitations of section 904, to a foreign
13    tax credit under section 901 for the 5 percent
14    withholding tax, and also to credit under section
15    902 for additional taxes based on UK sub's post-1986
16    pools of earnings and taxes in the year of
17    distribution.
18          "As noted above, only the unrefunded
19    portion of the ACT imposed on the distribution is
20    properly included in UK sub's tax pools, and the
21    adjustments to the pool would be required in the
22    event the full amount of the ACT does not apply to
23    reduce UK sub's mainstream tax."  And they go on to
24    cite.
25          And here is the part that's interesting:

1    "Taxes claimed as credits would be allocated

2    separate section 904-D categories based on

3    look-through rules to the earnings of UK sub out of

4    which the dividend is paid."  Then there's a cite.

5            Do you see that?

6        A.   Yes.

7        Q.   So there's a parallel there.  If it's

8    included in income, this is how you do it.  If it's

9    excluded from income, which is section B, the FSA

10   goes on to say, "The UK withholding tax is

11   acknowledged to be a credible tax in Article 23, 1-B

12   of the US/UK treaty.  According, in our view, the UK

13   withholding tax paid by parent with cash

14   distribution is creditable, even if the

15   distributions are excluded from income as

16   non-taxable stock dividends in the US."

17           That's consistent with what you said,

18   correct?

19       A.   I believe so.

20       Q.   Okay.  Now, the next sentence, "No credit

21   would be available under section 902 with respect to

22   the cash distribution, since no dividend would be

23   considered paid under US law."

24           That is inconsistent, am I correct, with

25   what you've testified about here today?

Page 252

```
 1        A.    (No response.)
 2        Q.    Then I will go on to read for you the next
 3   paragraph down, which says, "For section 904
 4   purposes, the withholding tax would be assigned to
 5   the general limitation category of section 904, D-1,
 6   I, see section 1.904-6 A-1, iiii, providing that a
 7   creditable tax paid with respect to an item that
 8   does not constitute income under US tax principles
 9   shall be treated as imposed with respect to general
10   limitation category."
11            Again, not treating it as a dividend for
12   US foreign tax credit purposes.
13            So in two separate instances, this FSA
14   very explicitly says that to the extent the amount
15   is not included in income, regardless of iii, for
16   foreign tax credit purposes the amount is not
17   treated as a dividend.
18            I want to get to your reaction to that in
19   terms of reconciling with your own analysis.
20            MR. BOEVING:  Objection, and my live note
21       stopped working.  Could we go off the record?
22            THE VIDEOGRAPHER:  The time is 6:04 p.m.
23            (Thereupon, a recess was taken, after
24       which the following proceedings were held:)
25            THE VIDEOGRAPHER:  Back on the record.
```

```
                                              Page 253
 1        The time is 6:06 p.m.
 2             THE WITNESS:  Your question is how do I
 3        reconcile it?
 4   BY MR. MADAN:
 5        Q.   Yes.
 6        A.   I don't.  I think I said that the -- I
 7   said long ago that the IRS would take -- might well
 8   take a different position.
 9        Q.   So you agree that -- oh, I'm sorry.
10        A.   And --
11        Q.   Please, I didn't let you finish.
12        A.   That they might take a different position.
13   And I also pointed out, although then it wasn't in
14   response to a question but now it will be, that FSAs
15   are not finding on examination or appeals, and I
16   would also be curious about whether this is actually
17   litigated or not, and how it was decided.
18        Q.   Regardless of whether it was litigated or
19   not, the branch chief responsible at the IRS
20   national office for managing the interpretation of
21   the foreign tax credits rules, including when treaty
22   issues come up, interpreted iii inconsistent with
23   your interpretation.  I have demonstrated two
24   instances in the two FSAs we reviewed, but there are
25   others.
```

1          And my question is:  Does that cause you

2    to pause about whether your interpretation is

3    accurate?

4          MR. BOEVING:  Just note my objection.

5          THE WITNESS:  No, not really.

6    BY MR. MADAN:

7      Q.   I mean, if we're doing a score card here,

8    let's review the bidding.

9          The TE interprets iii -- the TE, which was

10   drafted contemporaneously with the treaty itself,

11   interprets iii consistently with the way we do, at

12   least as it relates to direct investors, applying US

13   principles in calculating EMP and determining when a

14   dividend exists.

15         The IRS has, at least on two occasions,

16   that we've confronted you with here today, have

17   interpreted it, when confronted with very similar

18   questions of how to apply iii, interpreted it

19   consistently with the way Lehman's experts have

20   interpreted it.

21         There is no -- and perhaps this 1986

22   competent authority agreement, which I also have

23   reviewed, also interprets it consistently.

24         There is not contrary interpretation

25   either by the IRS or otherwise consistent with your

1  interpretation.

2       MR. BOEVING:  Objection, form and

3       foundation.

4  BY MR. MADAN:

5       Q.   Is that correct?

6       A.   I think that the chief counsel advice is

7  consistent with my interpretation.

8       Q.   The chief counsel advice in this case?

9       A.   Yes.

10      Q.   That's it, though?

11      A.   The field service advice are advisories

12 given, as I have -- they took different positions

13 with respect to different situations.

14      Q.   I mean, the thing that I have trouble

15 reconciling is, you, your report, indicates, and you

16 have testified here today, that the language in iii

17 is so clear, it is so definitional, it's so

18 obvious -- my words, not yours -- that an

19 alternative interpretation, certainly one that's

20 been articulated by our expert witnesses, is

21 inappropriate.  And yet, there have been three

22 interpretations, maybe four interpretations, of that

23 same provision that have been completely consistent

24 with our experts, and the people who are drawing

25 these interpretations are either experts in the IRS

1   national office or people who were contemporaneously

2   involved in the treaty negotiations.

3             I'm having a hard time reconciling that.

4   Maybe you can for me.

5             MR. BOEVING:  Same objection.

6             THE WITNESS:  Again, I do not remember

7        saying the words "obvious, incapable of other

8        interpretations," or any of the other

9        characterizations that you made of my prior

10       testimony.

11  BY MR. MADAN:

12       Q.   Okay.

13       A.   What I said is that in light of the range

14  of deviations from US domestic law, the provision at

15  issue, which may result in a change of character in

16  which Mr. Foster describes as unprecedented, is not

17  even particularly remarkable.

18            There is then a discussion of how the

19  exceptions to the saving clause work.

20       Q.   Let me ask the question this way:  Would

21  you agree, then, that iii is ambiguous enough that

22  the IRS itself could interpret it consistently with

23  the way Lehman has interpreted it, and repeatedly, I

24  might add, the technical -- the Treasury explanation

25  is consistent with our interpretation?

1           Is it ambiguous enough that different

2   people reading that provision could interpret it in

3   the two different ways the parties have in this

4   case?

5           MR. BOEVING:  Just note my objection.

6           You can answer.

7           THE WITNESS:  Obviously, the people at the

8      IRS are smart people.  Barbara Felker knows the

9      foreign tax credit rules inside and out.

10  BY MR. MADAN:

11      Q.   Yes.

12      A.   Barbara is not a tax treaty expert.  When

13  the IRS is interpreting things, they obviously are

14  making a conscientious effort to apply the rules.

15           Did they interpret this differently than I

16  would?  Obviously.

17           I have never -- I do not remember saying

18  this is clear or obvious or not capable of other

19  interpretations.

20      Q.   So it is capable of other interpretations?

21      A.   I have never said one way or the other

22  whether it is.  I believe -- and if you want to go

23  off the record briefly, I will go through and look

24  at the conclusions in my expert report.

25      Q.   I'm not trying to do that.  I just want to

1   ask you this one simple question.

2           Given what we've seen in the IRS's

3   interpretation and the TE, I mean, is it fair to say

4   that this provision is one in which different people

5   reviewing the provision could interpret it

6   differently?

7       A.   I suppose so, since you have a different

8   interpretation than I do.

9       Q.   I could have a different interpretation

10  from you, and you could think my interpretation is

11  objectively absurd, to use a word you used in

12  another context.

13          I'm asking you, objectively speaking, as a

14  treaty expert, whether it is objectively reasonable

15  to conclude that given the way this provision has

16  been interpreted, and not interpreted for that

17  matter, that it is reasonable that different people

18  could interpret that provision differently?

19      A.   The problem that the IRS has is that the

20  technical explanation is part of the Treasury

21  department's testimony to the Senate.  And,

22  therefore, it is difficult for the IRS to take

23  positions that are inconsistent with the technical

24  explanation.

25          That doesn't mean that objectively the

1    technical explanation is correct or not.  It is

2    simply that -- that the IRS is going to rely on the

3    technical explanation.

4        Q.   Could you just answer my question, though?

5    Mine is a yes-or-no one.

6             You just went on to explain or reconcile

7    why the IRS interpreted the way it did.

8             I think you know what my question is.

9        A.   Could you repeat it?

10       Q.   My question is:  Is it objectively

11   reasonable for different people, experts, reviewing

12   iii, to interpret it differently in the way the

13   respective parties in this case have?

14       A.   I was with you until you got to "in the

15   way that different experts have in this case."

16       Q.   Well, how about this.  I'll take the

17   experts out of it.

18            Differently in the way you have and the

19   way the IRS and the TE does?

20       A.   The TE was a reasonable attempt to try to

21   deal with a provision that didn't do what the

22   Treasury department wanted it to do.

23       Q.   I'm happy for you to give me whatever

24   answer you want after a yes or no.  You can say no,

25   you can say yes, but then you can clarify.  Can I

1   get a yes or no?

2        A.   The question of whether it is reasonable?

3        Q.   Yes.  Yes or no?

4        A.   Is it a reasonable interpretation of that

5   provision?  No.

6        Q.   The IRS's is unreasonable?

7        A.   No.  The technical explanation.

8        Q.   How about the IRS's?  Is the ones we've

9   just gone through, the 305 FSA, that is an

10  unreasonable interpretation of iii, is your

11  testimony?

12       A.   I don't think it's what iii means.

13       Q.   So you think that that FSA was

14  unreasonable?

15       A.   No, because the FSA was based on the

16  technical explanation.

17       Q.   Where in the FSA did you see that it was

18  based on the technical explanation?

19            By the way, just to be clear, because I'm

20  a little limited on time, you're referring to the

21  TE, Article 23, example 4, correct, when you say

22  that?

23            Hello?  You can look for it in a second.

24  Can you just answer my question?  I just want to

25  clarify what you mean by the TE, based on the TE.

Page 261

1    You mean --

2         A.    The examples related to direct dividends.

3         Q.    Specifically in example 4?

4         A.    I don't know if it was example 4.

5         Q.    But the samples relating to the direct

6    investors?

7         A.    Yes.

8         Q.    Yes.

9              If there's no citation to the examples in

10   the TE --

11        A.    The FSA refers to the technical

12   explanation in Rev Proc 80-18.  The technical

13   explanation of the US/UK treaty explains how the

14   unique features of the UK imputation system mesh

15   with the US foreign tax credit rules, particularly

16   with the rules of 902, and address issues involving

17   timing of the US foreign tax credit, see 1980-1, CV

18   455.  It's on page 5 of that one.

19        Q.    So you think that based on that, the IRS

20   national office was trying to stay consistent with

21   the TE in the examples?

22        A.    I believe so, without having gone back and

23   compared the facts of the FSA with the facts of

24   examples in the TE.

25        Q.    Okay.  Let me ask -- let me move away from