USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/8/15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
Lehman Brothers Holdings, Inc.,

                Plaintiff,

  and

Official Committee of Unsecured
Creditors of Lehman Brothers
Holdings, Inc. et al.,

                Plaintiff-Intervenor

  -against-

United States of America,

                Defendant.
------------------------------------------------------------X

10 Civ. 6200 (RMB)

**DECISION & ORDER**

## I. Background

On April 13, 2010, Plaintiff Lehman Brothers Holdings Inc. ("Lehman" or "Plaintiff"), a former broker-dealer currently in Chapter 11 proceedings in the United States Bankruptcy Court for the Southern District of New York, filed a complaint against the United States of America ("Government" or "Defendant") alleging that the Internal Revenue Service ("IRS") wrongfully disallowed certain foreign tax credits ("FTCs") claimed by Lehman for tax years 1999 and 2000. (See Compl., dated Apr. 13, 2010 ("Compl.").) [1] The Complaint also contends that Lehman was entitled, pursuant to Article 23 of the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital Gains, United States–

---

[1] Lehman's Complaint was originally filed as an adversary proceeding in the Bankruptcy Court on April 13, 2010. On November 9, 2010, this Court entered an order withdrawing the Bankruptcy Court reference. (See Administrative Order, dated Nov. 9, 2010.)

1

United Kingdom, Dec. 31, 1975, 31 U.S.T. 5668 ("Treaty"), to claim FTCs for taxes imposed by the United Kingdom on so-called substitute dividend payments ("Substitute Dividend Payments") received by one of Lehman's U.S. subsidiaries, Lehman Brothers, Inc. ("LBI"), from one of Lehman's U.K. subsidiaries, Lehman Brothers International (Europe) plc ("LBIE"), under the terms of "hundreds" of stock loan transactions (described below) entered into between LBI and LBIE. (See Compl. ¶¶ 11–20; Second Set of Revised Joint Stipulations of Fact, dated Sept. 3, 2014 ("Stips"), ¶ 15.) Lehman claimed a total of $141,412,611 of foreign tax credits on its 1999-2000 U.S. tax returns.[2]

On May 14, 2014, the Court approved the parties' joint stipulation of settlement with respect to three of the four issues initially presented in this case. (See Joint Stipulation and Order, dated May 14, 2014.) The four issues included: "[1] [W]hether 26 U.S.C. § 90l(k) applies by operation of Articles 10(2)(a)(iii) and 23(1) of [the Treaty] to disallow the foreign tax credits claimed by Plaintiff (the '90l(k) Issue'); [2] [W]hether or not Plaintiff should be treated, under Article 10(2)(a)(ii) of the Treaty, as having received 'a payment from the United Kingdom' and as having been subject to the deduction withheld from such payment for tax payable to the United Kingdom, in light of the provisions of Section 231AA of the United Kingdom Income and Corporation Taxes Act 1988 (the '231AA Issue'); [3] [W]hether common law doctrines, such as the economic substance or step transaction doctrines, apply to disallow the foreign tax credits claimed by Plaintiff (the 'Economic Substance Issue'); and [4] [W]hether Plaintiff is liable for accuracy-related penalties attributable to a substantial understatement or negligence or disregard of rules or regulations under 26 U.S.C. § 6662 (the 'Penalty Issue')." (Id. at 2–3.) The parties agreed that only

---

[2] The parties have agreed that "the following amount of disputed FTCs remain at issue: $21,783,153 (1999) and $45,387,837 (2000)." (Stips ¶ 7.)

2

the 901(k) Issue would be litigated. (Id. ¶¶ 1–2.) That is, the parties (sole) dispute is a legal one, i.e., "whether the Treaty causes a Substitute Dividend Payment—which is not a dividend under U.S. law—to be treated as a dividend for U.S. tax credit purposes and thus whether I.R.C. § 901(k), which is a 'limitation[] of the law of the United States' applicable to dividends, applies to deny the foreign tax credits claimed by LBI with respect to the Substitute Dividend Payments." (Stips ¶ 28.)

A bench trial was held on October 7, 2014 to resolve the 901(k) Issue. (See Trial Tr., dated Oct. 7, 2014 ("10/7/14 Tr.").) In preparation for the trial, Lehman submitted affidavits in lieu of direct testimony of its expert witnesses, David Foster and Steven Hannes, who testified about "the intent of the Treaty negotiators" and "how the customs, practices, and policies of the United States treaty negotiators are reflected in the structure of the Treaty and in the provisions in dispute." (See Affidavit of David S. Foster, dated Sept. 8, 2014; Affidavit of Steven Hannes, dated Sept. 8, 2014; Pl.'s Opp. to Gov. Mot. In Limine, dated Dec. 23, 2013, at 1.) [3] The Government also submitted in advance of trial the affidavit in lieu of direct testimony of its own expert witness, Patricia Brown, who testified, among other things, that "tax treaties invariably contain deviations from U.S. domestic tax law, and this does not generally pose any difficulties in the ratification process." [4] (Direct Testimony Affidavit of Patricia Brown, dated Sept. 8, 2014.) At trial, the Government had an opportunity to cross-examine Mssrs. Foster and Hannes (followed by re-direct), and Lehman had

---

[3] Mr. Foster served from 1972 to 1977 in various positions within the U.S. Treasury Department's Office of Tax Policy, including as International Tax Counsel. (Foster Affidavit at 1.) Mr. Hannes served from 1976 to 1982 as Associate International Tax Counsel in the Treasury Department's Office of Tax Policy. (10/7/14 Tr. at 22:25–23:1.)

[4] Ms. Brown served from 1994 to 2006 in various positions within the U.S. Treasury Department's Office of International Tax Counsel, including as Deputy International Tax Counsel. (Direct Testimony Affidavit of Patricia Brown, dated Sept. 8, 2014, at 1.)

an opportunity to cross-examine Ms. Brown (followed by re-direct).  The Court had an opportunity to observe the witnesses' demeanor and assess their credibility.

On December 2, 2014, the Government submitted Proposed Findings of Fact and Conclusions of Law, in which it contends that Lehman is not entitled to the claimed FTCs because: (i) "The plain language of [Article 10(2)(a)(iii) of] the Treaty makes clear that the sum of the substitute dividends LBIE paid LBI and the U.K. Payment [described below] 'shall be treated as a dividend for United States tax credit purposes'" and (ii) "Section 901(k) of the Internal Revenue Code . . . provides that no FTCs may be allowed for shareholders who receive dividends but either do not hold on to the stock for more than 15 qualifying days (and LBI never did) or have an obligation to make a related payment with respect to the stock (as LBI always did)." (Proposed Findings of Fact and Conclusions of Law of Def. United States of America, dated Dec. 2, 2014 ("Gov't Mem."), at 9.)

Also, on December 2, 2014, Lehman submitted a Post-Trial Brief in which it argues that "U.S. law has long excluded [substitute dividend] payments from the definition of dividends," and "when [Article 10(2)(a)(iii) of the Treaty] is read together with the other relevant Treaty provisions that consistently incorporate the U.S. definition of dividend, it is apparent that [the Treaty] does not override the U.S. definition of dividend but instead adopts it."  (Pl.'s Post-Trial Brief, dated Dec. 2, 2014 ("Pl. Mem."), at 1–2.)  Thus, according to Lehman, I.R.C. § 901(k), which only applies to U.S. dividends, "is inapplicable."  (Id. at 2.)

On December 23, 2014, Lehman and the Government each filed reply briefs.  (See Pl.'s Post-Trial Reply Br., dated Dec. 23, 2014 ("Pl. Reply"); Reply Br. in Supp. of Proposed Findings Of Fact and Conclusions of Law of Def. United States Of America, dated Dec. 23, 2014 ("Gov't Reply").)

4

**For the reasons stated below, the Court concludes that Plaintiff has failed to prove by a preponderance of the evidence and/or as a matter of law that it is entitled to the foreign tax credits claimed in this case.[5]**

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court's Findings of Fact and Conclusions of Law follow.

## II. Findings of Fact

The parties have stipulated to all the relevant facts which may be summarized as follows:[6]

1. Between April 6, 1999 and December 31, 2000, LBI, a U.S. subsidiary of Lehman, entered into hundreds of "stock loan transactions" with LBIE, Lehman's U.K. subsidiary. (Stips ¶ 15.) In each stock loan transaction, LBI borrowed shares of stock in U.K. corporations ("U.K. stock") from various third-party U.S.-based lenders "over" the stocks' respective dividend record dates, i.e., the dates on which the record owners of the stock became entitled to receive dividends declared by the stock issuers. (Id. ¶¶ 13, 18.) Within 1-2 business days of borrowing the U.K. stock, LBI lent ("on-lent") the stock to LBIE. (Id. ¶ 17.) When the U.K. corporations which issued the stock also issued dividend(s) to owners of the U.K. stock, LBIE, rather than LBI, received the dividend(s). (See id. ¶ 22.)

2. Where, as here, stock has been lent over the dividend record date, the lender does not receive the dividend because the borrower "becomes the record owner of the stock." (Id. ¶¶ 11, 14.) The borrower—in this case, LBIE—receives the dividend and is required, pursuant to the terms of

---

[5] **Any issues raised by the parties not specifically addressed herein were considered by the Court on the merits and rejected.**

[6] The Court incorporates by reference the entirety of the parties' Joint Stipulations of Fact, dated Sept. 3, 2014. If there is any inconsistency between the parties' stipulations and the Court's summary, the parties' stipulations apply.

5

the stock loan transactions, to make a Substitute Dividend Payment to the immediate prior lender in an amount equal to the dividend. (Id. ¶¶ 11, 14.) Thus, in the stock loan transactions at issue, whenever a dividend was paid to LBIE on a borrowed U.K. stock, LBIE made a Substitute Dividend Payment to LBI. LBI, in turn, made a Substitute Dividend Payment to the original U.S.-based lender on the same business day. (Id. ¶¶ 22–24, 29.) [7]

3.　　In 1973, i.e. prior to the Treaty, the United Kingdom implemented an "imputation" system that reduced the taxation of corporate dividend distributions at the shareholder level. (Id. ¶ 33.) Under this system, when a U.K. corporation paid a dividend to its shareholders, the U.K. corporation also paid a tax on the dividend, known as the Advance Corporation Tax ("ACT"). (Id. ¶ 34.) Under U.K. law, when an individual U.K.-resident shareholder received the dividend, that

---

[7] In an Administrative Order, dated October 8, 2014, the Court directed the parties to include in their post-trial briefs "the economic purpose(s) of the stock loan transactions at issue in this case." (Administrative Order, dated Oct. 8, 2014.) The Court believes this information is helpful background although it recognizes that, pursuant to the parties' Joint Stipulation and Order, dated May 14, 2014, the so-called Economic Substance Issue is no longer in dispute. (See discussion, supra, at pp. 2–3.)

The Government responded that "the evidence on the economic purpose of the Disputed Trades would have shown that for almost all of the trades, Lehman had no reason to borrow the U.K. stock as it had no profitable use for it . . . and that the only reason Lehman entered into these trades was to claim that the Treaty generated FTCs it could use to avoid paying U.S. taxes on millions of dollars of unrelated profits." (Gov't Mem. at 9.) Lehman responded that "[u]ses of the stock [loan transactions] included the following: (1) selling short the borrowed (as opposed to purchased) stock by the broker-dealer or customer, resulting in 'short' positions that generated profits when share prices fell; (2) covering 'fails,' for example, when a customer failed to deliver shares to the broker-dealer and the broker-dealer needed those shares to meets its delivery obligations; (3) financing stock lenders by providing liquid (e.g., cash) collateral in exchange for the borrowed stocks; (4) generating profits by arbitraging lender behavior in different global markets with respect to corporate elections (such as options to receive stock or cash dividends from the borrowed stock); and (5) using the borrowed stock for risk management (e.g., hedging) . . . ." (Pl. Mem. at 3.)

As noted, the Court's resolution of Lehman's claim is based principally upon the plain language of the Treaty. It is not based upon the economic substance or purposes of the stock loan transactions.

6

shareholder was also entitled to receive a tax credit from the United Kingdom in an amount equal to the ACT paid by the U.K. corporation. (Id. ¶¶ 33, 37–38.)

4. Prior to April 25, 1980, a non-U.K. resident who held shares in a U.K. corporation and who received a dividend from a U.K. corporation was **not** entitled to the U.K. ACT tax credit. (Id. ¶ 39–41.) The Treaty (between the United States and the United Kingdom, which became effective on April 25, 1980) was intended to address this disparity by allowing U.S.-resident recipients of U.K. corporation dividends to receive the same ACT tax credit that U.K.- resident recipients were entitled to under U.K. law. (See id. ¶¶ 14–16.)

**The Treaty**

5. The Treaty between the United States and United Kingdom was signed on December 31, 1975 and, as noted, became effective on April 25, 1980. Under Article 10(2)(a)(ii) of the Treaty, U.S. shareholders of U.K. corporation stock who receive a dividend, as defined by U.K. law, from a U.K. corporation are "entitled to a payment from the United Kingdom of the tax credit to which an individual resident in the United Kingdom would have been entitled had he received the dividend" ("U.K. Payment"). Treaty art. 10(2)(a)(ii). (See Pl. Mem., at 10–11.) During the 1999-2000 time period, the U.K. Payment was equal to one-ninth (or approximately eleven percent) of the dividend paid by the U.K. corporation. (Stips ¶¶ 26, 53.) Under Article 10(2)(a)(ii) of the Treaty, the U.K. Payment is subject to U.K. withholding—called a deduction ("U.K. Deduction")— that is capped at the amount of the U.K. Payment. (Id. ¶¶ 26, 42.)

6. Article 10(2)(a)(iii) of the Treaty provides that the "aggregate of the amount or value of the dividend and the amount of the [U.K. Payment] referred to in sub-paragraph[] (a) . . . (ii) . . . **shall be treated as a dividend for United States tax credit purposes.**" Treaty art. 10(2)(a)(iii) (emphasis added).

7

7. Article 23(1) of the Treaty also provides that "[i]n accordance with the provisions and subject to the limitations of the law of the United States, the United States shall allow to a [U.S. shareholder of U.K. corporation stock] as a [foreign tax] credit . . . the appropriate amount of [the U.K. Deduction] paid to the United Kingdom." Treaty art. 23(1). Article 23(1)(b) of the Treaty specifies that the U.K. Deduction "shall be treated as an income tax" imposed on the dividend received by the U.S. shareholder. Id. art. 23(1)(b). (See Stips ¶¶ 25–27.)

8. 26 U.S.C. § 901(k)(1)(A)(ii) "is a 'limitation[] of the law of the United States' applicable to dividends." (Id. ¶ 28.) This provision states: "In no event shall a [foreign tax] credit be allowed . . . for any withholding tax on a dividend with respect to stock in a corporation if . . . the recipient of the dividend is under an obligation . . . to make related payments with respect to positions in substantially similar or related property."

**Lehman's Claim for FTCs in 1999-2000**

9. The parties agree that "the Substitute Dividend Payments LBIE made to LBI . . . are not dividends under United States tax law." (Stips ¶ 51.) At the same time, since 1992, the United Kingdom definition of dividend has included Substitute Dividend Payments paid with respect to U.K. corporations' stock. (Id. ¶¶ 46–47.) During the 1999-2000 time period, "[e]ach Substitute Dividend Payment LBIE made to LBI . . . was thus a 'dividend[] paid by a corporation which is resident in the United Kingdom' for purposes of Article 10(2)(a) of the Treaty." (Stips ¶ 52.)

10. On its 1999 and 2000 U.S. tax returns, Lehman recorded as income the Substitute Dividend Payments that LBI received from LBIE, along with the corresponding U.K. Payment that LBI received from the U.K. Government pursuant to Article 10(a)(2)(ii) of the U.S.-U.K. Treaty. (Id. ¶ 29.) Lehman also deducted from income the amount of the Substitute Dividend Payments it paid to third-party lenders and it claimed a U.S. foreign tax credit on the basis of Article 23(1) of

8

the Treaty. (Id. ¶¶ 29–30.) For example (hypothetically), Lehman treated as taxable income the amount of $10 where the Substitute Dividend Payment was $90, i.e., the $90 Substitute Dividend Payment received by LBI from LBIE, plus the $10 U.K. Payment, minus the $90 Substitute Dividend Payment paid by LBI to its third-party lender. (Id. ¶ 29.) The U.S. tax on $10 (at the 35% corporate tax rate) was $3.50. Against this amount, Lehman claimed a foreign tax credit of $10 (i.e., the amount of the U.K. Deduction) under Article 23(1) of the Treaty, leaving a balance of $6.50 in U.S. FTCs which Lehman sought to use to offset other tax obligations. (Id. ¶¶ 29–31.)

### III. Conclusions of Law

As noted, the only dispute in this case is "whether the Treaty causes a Substitute Dividend Payment—which is not a dividend under U.S. law—to be treated as a dividend for U.S. tax credit purposes." (Stips ¶ 28.) [8] The answer is "yes."

1. "In construing a treaty, as in construing a statute, we first look to its terms to determine its meaning." United States v. Alvarez-Machain, 504 U.S. 655, 663 (1992); see also Rocca v. Thompson, 223 U.S. 317, 332 (1912). "Only when a treaty provision is ambiguous have we found it appropriate to give authoritative effect to extratextual materials." United States v. Stuart, 489 U.S. 353, 373 (1989) (Scalia, J., concurring).

2. The Treaty's plain language compels the conclusion that the Substitute Dividend Payments received by LBI in 1999 and 2000, plus the U.K. Payment received by LBI, are properly

---

[8] As discussed at p. 12, infra, an IRS Chief Counsel Advisory, dated March 24, 2006, appears unequivocally to answer this question in the Government's favor. IRS Chief Counsel Advisory, IRS CCA 200612013 (Mar. 24, 2006) ("The Treaty explicitly provides that a distribution that entitles a U.S. shareholder to benefits under Article 10(2)(a) of the Treaty [i.e., a Substitute Dividend Payment] will be treated as a dividend in the United States for U.S. foreign tax credit purposes."). **Neither party seems to have cited to, much less discussed, this Advisory in its briefs.** While not binding upon this Court, the Advisory's thorough analysis of Article 10(2)(a) is certainly instructive.

treated as dividend(s) under U.S. tax law.  Indeed, this appears to be the only reasonable meaning of Article 10(2)(a)(iii) which states that the "aggregate of the amount or value of the dividend and the amount of the [U.K. Payment] . . . **shall be treated as a dividend for United States tax credit purposes.**"  Treaty art. 10(2)(a)(iii) (emphasis added).

3. The Government argues (persuasively) that "[t]he references to 'the aggregate of the amount or value of the dividend and the amount of the tax credit' in Articles 10(2)(a)(i), 10(2)(a)(ii), and 10(2)(a)(iii) are to the same amount . . . In each case, this phrase refers to the sum of (a) the U.K. [defined] dividend paid by the U.K. issuer to the U.S.-resident shareholder and (b) the U.K. Payment (in the amount of the U.K. tax credit) received by the U.S.-resident shareholder with respect to that dividend." (Gov't Mem. at 11–12.)  "Thus, the plain meaning of Article 10(2)(a)(iii) is that the sum of the U.K. dividend and the U.K. Payment must 'be treated as a dividend for U.S. tax credit purposes.'" (Id. at 12.)

4. Lehman argues (unpersuasively) that the term dividend, as used in Article 10(2)(a)(iii) of the Treaty, does not refer to the U.K.-defined dividend referenced in Article 10(2)(a)(ii) of the Treaty, which includes Substitute Dividend Payments.  Rather, according to Lehman, it is appropriate to incorporate (import) into Article 10(2)(a)(iii) the U.S. definition of dividend, which does not include Substitute Dividend Payments.  Lehman would read Article 10(2)(a)(iii) as follows: "[T]he aggregate of the amount or value of [a U.S.-defined] dividend and the amount of the tax credit referred to in subparagraphs (a)(i) and (ii) of this paragraph paid by the United Kingdom to the United States corporation or other resident . . . shall be treated as a dividend for United States tax credit purposes."  Lehman's position contradicts the clear language (plain meaning) of Article 10(2)(a), including subparagraph (iii).

5. Lehman does not dispute that the term dividend as used in subparagraphs (i) and (ii) of Article 10(2)(a) of the Treaty refers to a U.K.-defined dividend and includes Substitute Dividend Payments. (See Pl. Mem. at 10–11.) Lehman contends that the term dividend refers to a U.K.-defined dividend in the first two subparagraphs of Article 10(2)(a) of the Treaty, but that it refers to a U.S.-defined dividend in the third subparagraph of Article 10(2)(a). Similarly, Lehman contends that the phrase "the aggregate of the amount or value of the dividend and the amount of the tax credit," which appears in all three subparagraphs of Article 10(2)(a), refers to a U.K.-defined dividend with respect to subparagraphs (i) and (ii) but refers to a U.S.-defined dividend with respect to subparagraph (iii).

6. Lehman's interpretation of the several Treaty provisions runs contrary to an established canon of construction that "similar language contained within the same section of a [statute or treaty] must be accorded a consistent meaning." See Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co., 522 U.S. 479, 501 (1998); see also Sacirbey v. Guccione, 589 F.3d 52, 66 (2d Cir. 2009) ("[B]asic canon[s] of statutory interpretation [are] equally applicable to interpreting treaties."). Lehman also inconsistently "cherry picks" among various provisions of the Treaty to achieve a desired (tax) result. That is, by inconsistently interpreting the term dividend within Article 10(2)(a), Lehman seeks to obtain the benefits provided for in subparagraph (ii) (i.e., Lehman's entitlement to the U.K. Payment and the corresponding foreign tax credit under Article 23(1)), while avoiding the negative ramifications of subparagraph (iii) (i.e., the limitations of U.S. law upon dividend-based FTCs). See IRS Chief Counsel Advisory, IRS CCA 200612013 (Mar. 24, 2006) ("It is the well established position of the Internal Revenue Service . . . that taxpayers may not 'cherry pick' among the provisions of the Code and the income tax treaties to which the United States is a party.").

7. As noted at footnote 8 above, the March 24, 2006 IRS Chief Counsel Advisory evaluated a taxpayer's contention (which was nearly identical to Lehman's contention here) that "the Treaty's purported characterization of the substitute [dividend] payments and deemed refunds of ACT as dividends applies to allow it to claim foreign tax credits under the Treaty for amounts deemed withheld from those payments, but is jettisoned for purposes of applying the statutory limitations on the foreign tax credit, such as section 901(k), that the Treaty in Article 23(1) incorporates by reference." IRS CCA 200612013. The IRS concluded that the taxpayer's position was contrary to the "plain language of Article 10 of the Treaty," and observed that "Article 10(2)(a)(iii) of the Treaty states explicitly and unambiguously that payments that are treated as dividends under Article 10 of the Treaty [i.e., Substitute Dividend Payments] shall be treated as dividends for U.S. foreign tax credit purposes." Id. "The Treaty explicitly provides that a distribution that entitles a U.S. shareholder to benefits under Article 10(2)(a) of the Treaty will be treated as a dividend in the United States for U.S. foreign tax credit purposes." Id.

8. Lehman also argues (again, unpersuasively) that adopting the plain meaning of Article 10(2)(a)(iii) is tantamount to "overrid[ing] U.S. law by requiring that [Substitute Dividend Payments] be treated as 'dividends' for U.S. foreign tax credit purposes." (Pl. Mem. at 1.) The Court concludes that Article 10(2)(a)(iii) unequivocally (and beyond question) provides that "the aggregate of the amount or value of the dividend and the amount of the [U.K. Payment] . . . **shall be treated as a dividend for United States tax credit purposes.**" Treaty art. 10(2)(a)(iii) (emphasis added). The Government notes correctly that U.S. tax law provides for such "treatment" in other circumstances as well. See 26 U.S.C. § 871(m) ("For purposes of [certain provisions,] a dividend equivalent," including "any substitute dividend made pursuant to a securities lending . . . transaction," "shall be treated as a dividend . . . .").

12

9. Lehman does not proffer any historical evidence, even assuming <u>arguendo</u> that such evidence were probative, to negate the Court's interpretation of Article 10(2)(a)(iii). Indeed, Lehman does not cite to any documentary evidence that addresses directly the kind of issue(s) presented here, including the 2006 IRS Chief Counsel Advisory. (<u>See</u> Pl. Mem. at 18-22.) [9]

10. It appears to the Court that the only meaningful mention of Article 10(2)(a)(iii) during the Treaty ratification process is contained in a Senate Foreign Relations Committee Report, dated April 25, 1978 ("Senate Report"), and that the Senate Report is entirely consistent with the plain language of the Treaty. The Senate Report states: "The proposed treaty provides that for U.S. foreign tax credit purposes the U.S. shareholders are to be treated as having received a dividend equal to the distribution paid plus an amount equal to the full refund payable to U.K. shareholders." (Senate Report, Joint Ex. 44, at 22.)

11. Section 901(k)(1)(A)(ii) of the Internal Revenue Code provides as follows: "In no event shall a [foreign tax] credit be allowed . . . for any withholding tax on a dividend with respect

---

[9] Lehman's experts, Mssrs. Foster and Hannes, did not provide any evidence that the issue presently before this Court was ever addressed during the Treaty negotiations or in the U.S. Senate. (<u>See</u> 10/7/14 Tr. at 126:25–127:4 ("Q: Now, when the Treaty was being negotiated in the 1970s nobody was thinking about stock lending or substitute dividends, is that right? MR. FOSTER: I certainly wasn't, and I don't think anyone else was either, correct.").)

And, both Mr. Hannes and Mr. Foster confirmed that they did not participate in negotiating the Treaty. (<u>Id.</u> at 22:13–19 ("Q: And your role as the IRS representative on the negotiating team was to observe and take notes, correct? MR. HANNES: Observe, take notes, comment . . . THE COURT: Did you negotiate? MR. HANNES: No, sir."); <u>id.</u> at 110:8–12 ("Q: And you were not involved in the negotiations that led to the original 1975 U.S.-U.K. Tax Treaty edition in this case, right? MR. FOSTER: I wasn't in the negotiating sections for the underlying Treaty, that's correct.").) Mr. Hannes also testified that he has "no firsthand knowledge" of the purpose of Article 10(2)(A)(iii) of the Treaty. (<u>Id.</u> at 55:6–12 ("Q: But isn't it true that you actually have absolutely no understanding of why Article 10(2)(a)(iii) mandates aggregation of the two amounts listed there? A: I personally did not draft this provision. Q: You have no idea why it mandates aggregation, correct? A: I am not going to speculate. I have no firsthand knowledge.").)

to stock in a corporation if . . . the recipient of the dividend is under an obligation . . . to make related payments with respect to positions in substantially similar or related property." 26 U.S.C. § 901(k)(1)(A)(ii). Thus, Lehman's FTC claims under the Treaty were properly disallowed by the IRS under Section 901(k)(1)(A)(ii). See also IRS Chief Counsel Advisory, IRS CCA 200612013 (Mar. 24, 2006) ("Given that the Treaty's classification of a payment as a dividend is applicable for purposes of Article 23 and section 901(k), it is our opinion that the substitute payments received by Taxpayer and the deemed ACT refunds, to the extent allowable under the Treaty, are described in section 901(k)(1)(A)(ii) . . . and, therefore, the foreign tax credits claimed for taxes deemed withheld from the deemed ACT refunds with respect to such payments are disallowed."). That is, Lehman seeks improperly to obtain FTCs based upon a withholding tax (i.e., the U.K. Deduction) which was imposed on a dividend, as defined in Article 10(2)(a)(iii) of the Treaty. LBI, the "recipient of the dividend," was "under an obligation . . . to make related payments" (i.e., a corresponding Substitute Dividend Payment) with respect to the U.K. stock upon which the dividend was paid.

12. In its Post-Trial Brief, Lehman takes issue only with the Government's interpretation of the relevant Treaty provisions, and appears to offer no disagreement with respect to the Government's interpretation of Section 901(k)(1)(A)(ii). (See Pl. Mem. at 1.) This tracks the parties' Joint Stipulation of Facts, dated September 3, 2014, in which the parties agreed that "the sole remaining issue in the case is whether the Treaty causes I.R.C. § 901(k) to become applicable to the Disputed Trades to deny Lehman's entitlement to the Disputed FTCs." (Stips ¶ 9.)

13. Finally, in a footnote in its Reply, Lehman states that "[e]ven if the Treaty converts [substitute dividend] payments into dividends for purposes of section 901(k), that section would not in any event apply as the Government has not shown that the Treaty converts the parties'

contractual arrangements into 'stock,' nor that the payor of such 'dividend' was a company other than LBI . . . ." This (for good reason) nearly hidden argument is unaccompanied by any supporting authority and is contradicted flatly by the IRS Chief Counsel's interpretation of Section 901(k)(1)(A)(ii). See IRS CCA 200612013; see also Connecticut Bar Ass'n v. United States, 620 F.3d 81, 91 n.13 (2d Cir. 2010) ("Issues raised for the first time in a reply brief are generally deemed waived."); In re Crude Oil Commodity Litigation, No. 06 Civ. 6677, 2007 WL 2589482, at *3 (S.D.N.Y. Sept. 7, 2007) ("Arguments which appear in footnotes are generally deemed to have been waived.")

## IV. Conclusion & Order

For the foregoing reasons, the Clerk of the Court is respectfully requested to enter judgment in favor of the Government and against Lehman. The Clerk of the Court is further directed to close this case.

Dated: New York, New York
May 8, 2015

*RMB*

**RICHARD M. BERMAN, U.S.D.J.**

15